**Oliver D. LYLE, Plaintiff,**

v.

**Cliff TERESI, Mayor, et al., Defendants.**

**No. 4–69 Civ. 306.**

United States District Court,
D. Minnesota,
Fourth Division.

April 17, 1971.

Merlin, Starr, Oleisky & Kiefer, by William Merlin, Minneapolis, Minn., for plaintiff.

Best, Flanagan, Lewis, Simonet & Bellows, by Harold C. Evarts, Allen D. Barnard and Robert M. Skare, Minneapolis, Minn., for defendants.

NEVILLE, District Judge.

This is an action brought by a black musician and part-time college student under various sections of the civil rights acts, particularly 42 U.S.C. § 1983, originally against the Village of Golden Valley, its councilman, police chief and four police officers. For the first nine months of the year 1969, defendant played a musical instrument in a band at night at an establishment called the Point Supper Club, situate near the center of the Village of Golden Valley, a

suburb of Minneapolis. Plaintiff alleged in general terms a conspiracy among the Village officials to deprive him of his civil rights, and cited as overt acts done in pursuance thereof some nine times more or less during the first months of 1969 that the Golden Valley Police without proper justification as he claims stopped his automobile while being operated on the streets of Golden Valley. On four of these occasions, the police arrested him by issuing a traffic ticket, including one occasion in February 1969 when he was incarcerated for a brief time and his car was towed away. He claims that he is the victim of a conspiracy by the Village officials against all persons of the black race and that its impact particularly was felt by him and he became a victim thereof and suffered damages thereby.

Prior to trial under date of March 6, 1970 the court on motion dismissed the suit as to the Village of Golden Valley on the grounds that the Civil Rights Act, 42 U.S.C. § 1983, does not apply to municipal corporations. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L. Ed.2d 492 (1961), and numerous cases decided since.

As to four of the defendants, Everett Frandsen, Chief of Police, Ronald Pavlóck, David Niebur, James Zelinsky, police officers, the jury returned a verdict of $4,000 in plaintiff's favor.

■ Defendants' first attack on the verdict is that it is not supported by the evidence. Although plaintiff's evidence is far from compelling, construing the testimony and the exhibits most favorably to the plaintiff and indulging in the reasonable inferences most favorable to plaintiff to be drawn therefrom, the court cannot say as a matter of law that the jury could not find a concert of action and at least a tacitly agreed upon common purpose and intention on behalf of the four defendants against whom the verdict was returned and other Village officials to discriminate against, and to be at least somewhat more avid and persevering in their surveillance of

and vigilance toward members of the black race than as against white persons or others. The Village contains many well-to-do homes and its approximate 25,000 inhabitants are almost entirely members of the white race. One of the defendants testified that perhaps 20 black families are residents of the Village. The Village borders on the East and North, however, a section of Minneapolis which is rather heavily populated with blacks. There was testimony that many blacks come into the Village to shop and to enjoy abutting public park facilities. A check of the police records revealed that over a period of more than a year, approximately 21% of all arrests in the Village were black persons; of 164 arrests of blacks or minority persons, one-half were by the three police officer defendants against whom the jury returned a verdict.

■ The court is aware that a conspiracy rarely can be proved by evidence of a group gathering "in a smoke filled room" and plotting and planning or adopting a common objective, purpose or method of proceeding. Circumstantial evidence must be relied on. Accordingly under the conscious paralellism doctrine—by analogy to antitrust cases, see United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), and its progeny—the court permitted plaintiff to produce as overt acts evidence not only of treatment claimed to be administered to him but the cases of three other black men and a letter concerning a fourth who in or about the same period were stopped and arrested on separate occasions by the Golden Valley police. This of course resulted in three little law suits within the major law suit since the court felt it should, and did, permit defendant to produce for the jury's consideration its version of the facts as to each of these incidents produced by plaintiff. The jury might well have believed on contradictory evidence that one or some of the arrests were quite justified and that the force used in some or one of the cases and steps taken were no more than necessary in

the premises. Again, however, the court cannot say as a matter of law that the jury could not find a pattern or a common tacitly understood discriminatory method of treating blacks from this evidence.

■ It is true also that there is no substantial empirical evidence as to how defendants treated whites, or that they treated them differently than blacks; that is, there is no measuring stick in that sense against which to judge whether defendants' conduct was discriminatory. The jurors in this regard, however could draw on their own common experiences and use ordinary good sense. Undoubtedly all of them have been stopped by police officers on one or more occasions and they could develop a sort of norm analogous to custom and usage, as to expected treatment by law enforcement officers for violation of traffic laws. They were entitled to adopt a standard of reasonableness. This vacuum in the evidence if such it be is not in the court's opinion fatal to plaintiff's case. If a plaintiff in this type of case is required to prove an exact standard for treatment of whites to use as a yard stick, it is doubtful whether any plaintiff ever will be able to establish a case. Certainly defendants are not expected to admit a difference and to procure a number of white persons to appear and to testify is asking the next to impossible and very probably couldn't well establish a very reliable standard in any event.

All in all the court conceives the case to have presented a jury issue. As to the various events which occurred, some of the defendants participated to a greater or lesser extent than others and at different times. Nevertheless whether a conspiracy existed and its effect was a fair question for the jury and the court denies defendants' motions directed to the point that there was no evidence to support the verdict.

■ Plaintiff seeks an allowance from the court of attorney's fees. In reviewing the various provisions of the civil rights act referred to in plaintiff's complaint, the only reference the court can find to the awarding of attorney's fees is lodged in 2000a–3 the section relating to discrimination in places of public accommodation. As hereinafter stated, the court believes this section has no application to this case. Section 1983 has no provision for allowance of attorneys fees. There is a line of cases, however, where attorneys fees have been awarded to a successful civil rights litigant where the action has been brought under § 1983. For the most part these authorities relate to racial discrimination in educational institutions, but they are none the less Section 1983 cases and fees are allowed in the court's discretion. They are allowed not simply to penalize litigants, but to encourage individuals injured by racial discrimination to seek judicial relief. Bell v. School Board, 321 F.2d 494, 500 (4th Cir. 1963), reversing the lower court's refusal to allow attorneys fees; Rolfe v. County Board of Education, 391 F.2d 77 (6th Cir. 1968); Hill v. Franklin County Board of Education, 390 F.2d 583 (6th Cir. 1968); Dyer v. Love, 307 F.Supp. 974, 986 (N.D.Miss.1969). The concept of private attorneys general undoubtedly prompted Congress so to provide in 2000a–3(a). Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 401–402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968):

"When the Civil Rights Act of 1964 was passed, it was evident that enforcement would prove difficult and that the Nation would have to rely in part upon private litigation as a means of securing broad compliance with the law. A Title II suit is thus private in form only.

When a plaintiff brings an action under that Title, he cannot recover damages. If he obtains an injunction, he does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority. If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be

in a position to advance the public interest by invoking the injunctive powers of the federal courts: Congress therefore enacted the provision for counsel fees—not simply to penalize litigants who deliberately advance arguments they know to be untenable but, more broadly, to encourage individuals injured by racial discrimination to seek judicial relief under Title II."

The court fully realizes that this quoted language is in reference to an express statutory provision for the allowance of attorney's fees and that this case is not a Section 2000a–3(a) case. Nonetheless the same arguments pervade the Section 1983 decisions allowing attorney fees despite the lack of express statutory authority therefor. The court feels that a reasonable attorney's fee should be allowed in this case.

■■ Counsel has presented an affidavit as of October 20, 1970, evidencing that he has expended 10½ days trial time before this court, plus 53¼ hours in preparation and that a younger associate expended some 200 hours working on the case. At Minnesota minimum Bar association fee schedule rates, plaintiff's counsel has estimated his total attorneys fees at $11,280. In addition his out-of-pocket costs are $686.72. The court of course observed counsel's work at least on preliminary motions and at the trial but in allowance of attorney's fees, attention must be paid to the amount recovered and the results obtained. Defendants' counsel stated in open court that plaintiff's counsel had been retained by plaintiff on a contingent fee basis, which was not denied. The court observed that plaintiff's counsel undertook and proceeded with the case with vigor and ingenuity, granted that some of his efforts including a number of pretrial motions were abortive and perhaps ill advised. Though he represented his client well and with sincerity, the court cannot possibly award plaintiff any such amount as he is requesting. Having in mind the size of the

verdict, the services rendered, the defenses raised and all the circumstances, the court allows plaintiff an attorney's fee of $1,000, to be added to the present judgment. As to out-of-pocket expenses, those which can be taxed as costs ought to be so treated; no allowance for such otherwise can be made.