## CITY OF MINNEAPOLIS AND OTHERS v. SAMUEL L. RICHARDSON.

239 N. W. 2d 197.

January 23, 1976—No. 45462.

---

*Warren Spannaus,* Attorney General, *Peter W. Sipkins,* Solicitor General, and *Richard L. Varco, Jr.,* Special Assistant Attorney General, for appellant.

*Walter J. Duffy, Jr.,* City Attorney and *Jerome F. Fitzgerald,* Assistant City Attorney, for respondents.

Heard before Peterson, Kelly, and MacLaughlin, JJ., and considered and decided by the court en banc.

KELLY, JUSTICE.

Samuel L. Richardson, former Minnesota Department of Human Rights commissioner, appeals from an order of the district court reversing an order of a hearing examiner finding an unfair discriminatory practice contrary to Minn. St. 1971, § 363.03, subd. 4, and ordering certain relief.[1] We reverse.

On April 23, 1971, Mary Jane Samples, acting on behalf of her 12-year-old son Randolph, filed a verified charge of racial discrimination with the Department of Human Rights pursuant

---

[1] The procedural history of this case is as follows: Mrs. Samples filed a charge of discrimination on behalf of her son. (Minn. St. 1971, § 363.06, subd. 1.) The commissioner of human rights found that probable cause existed to credit her allegations of unfair discriminatory practices and served a complaint on respondents. (§ 363.06, subd. 4[2].) Conciliation efforts by the commission failed. (§ 363.06, subd. 5.) A hearing was conducted before a hearing examiner who found that an unfair discriminatory practice had occurred and ordered certain relief. (§ 363.071, subds. 1 and 2.) Respondents appealed the hearing examiner's order to the district court. (§ 363.072, incorporating the appellate procedures of the Administrative Procedure Act, Minn. St. 15.0424.) The district court reversed, and appeal was taken to this court. (§ 363.10, allowing by implication appeals to this court as provided in Rule 103.03[b] and [h], Rules of Civil Appellate Procedure.)

to Minn. St. 363.06, subd. 1. The commissioner of human rights, unable to obtain relief from the alleged discriminatory practices against Randolph Samples through conciliation, served and filed a complaint and notice of hearing on September 27, 1972. As subsequently amended that complaint named as respondents:(1) The city of Minneapolis; (2) Gordon Johnson, chief of police of that city; (3) Basil Lutz, former chief of police of that city; (4) five individual police officers of that city.

The matter was heard before a duly appointed hearing examiner on May 14, 15, and 17, 1973. The examiner entered an order dismissing the complaint against the five individual police officers on the grounds that insufficient evidence was adduced at the hearing to establish their liability. The insufficiency resulted because the individual officers did not appear at the hearing and were not properly identified by Samples or anyone else. The record reveals that attempts on the part of a private investigator to serve subpoenas on the officers were met in two cases by responses that the officers were not home and were not expected until late. In one of those cases the investigators reported seeing an unidentified man in the window as he walked up to the officer's house. From these and other facts, the hearing examiner concluded that an inference of evasion of service was possible and granted a recess to allow counsel for the commissioner to decide whether to seek contempt citations in the district court. Counsel, however, elected to stand on the record and the complaint against the individual officers was dismissed. No issue regarding this has been raised or presented on appeal.

On February 21, 1974, the hearing examiner entered findings of fact, conclusions of law, and an order, the substance of which, as supplemented by the record, is as follows:

Randolph S. Samples, a 12-year-old black youth was walking down Hennepin Avenue at approximately 1 p.m. on April 10, 1971, in the city of Minneapolis. While walking from a store where he had purchased a poster toward Seventh Street and Hennepin Avenue where he was going to catch a bus, his attention

was drawn to a disturbance in the street. Minneapolis police were arresting two males and a crowd had gathered near this event. Samples walked closer to the crowd to find out what was happening. The police requested that people clear the street. Several minutes later, police informed the crowd that it had 5 seconds to clear the sidewalk, and began employing trained police dogs to disperse the crowd. A dog leaped at a man walking behind Samples, and bit him in the hand. The dog then leaped at Samples. Samples struck the dog with his rolled poster, and the dog pounced on him, apparently knocking him to the ground. Two police officers then grabbed Samples by the feet and dragged him face down an estimated 24 to 32 feet to a squad car.

While driving Samples to a Minneapolis police station, the two officers used a racial epithet toward Samples and made other derogatory remarks. The record, consisting only of the testimony of Samples on this point, reveals the following:

"Q.   Was there any conversation between yourself and the officers in the car as you were driving to the court house?

"A.   Yes, one of the policemen, the driver said you dumb fucker, you should have gotten out of the way and I said I didn't have a chance and—

\*   \*   \*   \*   \*

"And then when we got there [i.e., to the police station] one of them [i.e., the officers] said too bad the dog didn't get the nigger and the other one said I'm sure he's had enough niggers for today."

After arriving at the station, Samples was taken into the police station were one of the officers proceeded to threaten him with a police dog. Samples was brought out of an office into the hall and made to confront the dog. Shortly thereafter, the officers brought Samples to the juvenile center where they again threatened him with the dog. No charges were filed against Samples, and he was subsequently released in the custody of his parents.

From the above version of the incident, which stood uncontra-

dicted because respondents presented no testimony,[2] the examiner concluded that an unfair discriminatory practice in the full utilization of or benefit from public services in violation of Minn. St. 1971, § 363.03, subd. 4, had occurred. We do not know why respondents did not present testimony but do wish to note that we are a reviewing court and must take the record as we find it. The examiner also found that the chief of police and the city were liable on theories of respondeat superior and failure to discipline the officers involved. The examiner entered an order directing relief. [3]

The chief of police and city appealed the hearing examiner's order to the district court pursuant to Minn. St. 363.072. That

---

[2] The individual officers involved in this incident did testify, however, in a Federal civil rights action against them based on this incident. That action, which had been brought in United States District Court for the District of Minnesota, Case No. 4-72, Civil 75, Earl Larson, J., concluded with a jury verdict for the officers on June 12, 1974. That result has no bearing on our decision.

[3] "It Is HEREBY ORDERED that the Respondents City of Minneapolis, and Chief of the Minneapolis Police Department direct a letter written of apology to Randolph S. Samples for the aforementioned discriminatory conduct of its employees on April 10, 1971; and

"It Is FURTHER ORDERED that Respondents City of Minneapolis and Chief of the Minneapolis Police Department, compensate Randolph S. Samples the sum of $100.00 as punitive damages for aforesaid discriminatory conduct of April 10, 1971; and

"It Is FURTHER ORDERED that Respondents City of Minneapolis and Chief of the Minneapolis Police Department cease and desist from further discriminating against any person because of race or color in the full utilization of and benefit of the public services of that Police Department; and

"It Is FURTHER ORDERED that Respondents City of Minneapolis and Chief of the Minneapolis Police Department, cause to be created and create an internal system of review for complaints of racial discrimination against employees of the Police Department with official record keeping of testimony and any findings therefrom together with a final written report to be submitted to the complaining party to remedy the opportunity for future discriminatory conduct."

court reversed the examiner's finding of an unfair discriminatory practice and, apparently in the alternative, also voided the effective provisions of the examiner's order for relief. The commissioner appeals to this court pursuant to Minn. St. 363.10 and Rule 103.03(b) and (h), Rules of Civil Appellate Procedure. Two issues are raised on appeal: (1) Whether the record supports the conclusion that an unfair discriminatory practice occurred; (2) whether the hearing examiner acted properly in: (a) granting punitive damages against the city and its police chiefs; and (b) ordering them to write a letter of apology.

■ Appellant challenges the action of the district court in setting aside the examiner's conclusion that an unfair discriminatory practice had occurred. While the district judge did not assail the factual findings of the examiner, he concluded:

"* * * [T]he evidence does not show that the treatment [Samples] received was essentially different from that accorded others, that it was racially motivated, or that it was so different from what the police would accord to others under the same circumstances that no conclusion other than the existence of discrimination is reasonable."

This issue of statutory interpretation is one of first impression before this court. The relevant statute, Minn. St. 1971, § 363.03, subd. 4, provides:

"It is an unfair discriminatory practice: To discriminate against any person in the access to, admission to, full utilization of or benefit from any public service because of race, color, creed, religion, or national origin."

Public service is defined in § 363.01, subd. 19, as—

"* * * any public facility, department, agency, board or commission, owned, operated or managed by or on behalf of the state of Minnesota, or any subdivision thereof, including any county, city, borough, town, township, or independent district in the state."

It is undisputed that the city of Minneapolis and its police department are public services within the above definition. What is disputed is essentially this: (1) Whether the record herein establishes discrimination *because of race,* and, if so: (2) whether the record establishes discrimination *in the access to, admission to, full utilization of or benefit from any public service,* within the meaning of the aforementioned statute.

Minn. St. 363.01, subd. 10, of the Human Rights Act, unchanged since it was enacted in 1955,[4] defines "discriminate" as follows: "The term 'discriminate' includes segregate or separate." The ordinary meaning of discrimination is well expressed in two of the dictionary definitions cited by the district court:

"DISCRIMINATION. * * * In general, a failure to treat all equally * * *." Black, Law Dictionary (Rev. 4 ed.) p. 553.

"*discriminate* * * * 2: to make a difference in treatment or favor on a class or categorical basis in disregard of individual merit * * *." Webster's Third New International Dictionary (1961) p. 648.

The concept articulated in the above definitions is distinction in treatment of individuals based upon impermissible or irrelevant factors such as race, color, creed, sex, etc.

To establish the existence of such a distinction, it is often essential to show how similarly situated individuals who do not possess the impermissible or irrelevant factor are treated. For example, to establish discrimination in the arrest of a black person, one might undertake to show that white persons, whose behavior was substantially the same as the black person's, were not arrested. But, in some cases, this may be an unreasonably difficult burden on those charging discrimination. An act of discrimination may involve a situation so unique that such a com-

---

[4] L. 1955, c. 516, § 3, subd. 10.

parison is impossible.[5] In these cases, it is reasonable to require a prima facie showing of treatment so at variance with what would reasonably be anticipated absent discrimination that discrimination is the probable explanation. When such a showing has been made, it is reasonable to require an opposing party to respond with evidence of a permissible basis for the distinction being made.

Because this is a case of first impression, we adopt an explicit standard, based on the above discussion, which defines an unfair discriminatory practice in the area of public services. The standard we adopt is similar to that suggested by the district court: A finding that an unfair discriminatory practice has occurred may be made when the record establishes (1) an adverse difference in treatment with respect to public services of one or more persons when compared to the treatment accorded others similarly situated except for the existence of an impermissible factor such as race, color, creed, sex, etc.; or (2) treatment so at variance with what would reasonably be anticipated absent discrimination that discrimination is the probable explanation.

---

[5] A good example of this kind of situation may be found in Lyle v. Teresi, 327 F. Supp. 683 (D. Minn. 1971), a Federal civil rights action brought under 42 USCA, § 1983, and other Federal statutes. Plaintiff was a black musician who made frequent business trips to Golden Valley. Nine times during a nine-month period members of the Golden Valley Police Department allegedly stopped plaintiff's car without proper justification. On three occasions he was ticketed and on a fourth he was arrested and incarcerated and his car was towed away. A jury returned a verdict finding a violation of plaintiff's civil rights and assessing damages against defendant police officers of $4,000. In denying a motion to set aside the verdict, Judge Neville stated (327 F. Supp. 685): "It is true also that there is no substantial empirical evidence as to how defendants treated whites, or that they treated them differently than blacks; that is, there is no measuring stick in that sense against which to judge whether defendants' conduct was discriminatory. The jurors * * * could draw on their own common experiences and use ordinary good sense. * * * They were entitled to adopt a standard of reasonableness."

We emphasize that we adopt this standard as a guide to the evaluation and review of evidence in discrimination cases. The scope of review is confined to those matters set forth in Minn. St. 15.0425.[6] As we have held before, where evidence is conflicting or undisputed evidence permits more than one inference to be drawn, the findings of the examiner must be upheld by the reviewing court.[7]

Applying the above standard to the instant case, we find substantial evidence of discrimination because of race. The uncontradicted testimony of Randolph Samples indicates that two Minneapolis police officers addressed him in a racially derogatory manner. We cannot regard use of the term "nigger" in reference to a black youth as anything but discrimination against that youth based on his race. As one Federal district court commented in reference to the use of this term by Mobile, Alabama, police:

---

[6] Minn. St. 15.0425 provides: "In any proceedings for judicial review by any court of decisions of any agency as defined in Minnesota Statutes, Section 15.0411, Subdivision 2 (including those agencies excluded from the definition of agency in section 15.0411, subdivision 2) the court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious."

[7] Minneapolis Van & Warehouse Co. v. St. Paul Terminal Warehouse Co. 288 Minn. 294, 299, 180 N. W. 2d 175, 178 (1970). See also, Quinn Distributing Co. Inc. v. Quast Transfer, Inc. 288 Minn. 442, 181 N. W. 2d 696 (1970); Minnesota Microwave, Inc. v. Public Service Commission, 291 Minn. 241, 190 N. W. 2d 661 (1971); Gibson v. Civil Service Board, 285 Minn. 123, 171 N. W. 2d 712 (1969). See, Brotherhood of Ry. & Steamship Clerks, etc. v. State, 303 Minn. 178, 229 N. W. 2d 3 (1975).

"* * * Because of the history of servitude and discrimination against the blacks, the rightfully emerging recognition of their individual dignity, and their pride of race, many blacks are extremely sensitive when whites use this term in any sense." Allen v. City of Mobile, 331 F. Supp. 1134, 1145 (S. D. Ala. 1971), affirmed per curiam, 466 F. 2d 122 (5 Cir. 1972).[8]

When a racial epithet is used to refer to a person of that race, an adverse distinction is implied between that person and other persons not of his race. The use of the term "nigger" has no place in the civil treatment of a citizen by a public official. We hold that use of this term by police officers coupled with all of the other uncontradicted acts described herein constituted discrimination because of race.

It is suggested that any discrimination in the arrest and detention is not discrimination "in the access to, admission to, full utilization of or benefit from" a public service within the meaning of Minn. St. 1971, § 363.03, subd. 4. We reject any such narrow construction of the statute. It is not disputed that the Minneapolis police department is a public service within the definition of that term in § 363.01, subd. 19. Civil, non-discriminatory treatment of citizens by police is an important part of the full utilization of and benefit from police services. Any other construction would defeat the intent of the legislature that the Human Rights Act be liberally construed to aid in the elimination of discrimination in public services. Minn. St. 1971, §§ 363.11, 363.12, subd. 1; State, by Balfour, v. Bergeron, 290 Minn. 351, 187 N. W. 2d 680 (1971).[9]

---

[8] See, also, Alcorn v. Anbro Engineering, Inc. 2 Cal. 3d 493, 498, 86 Cal. Rptr. 88, 91, 468 P. 2d 216, 219 (1970) (holding the term "abusive and insulting").

[9] See, also, Auerbach, *The 1967 Amendment to the Minnesota State Act Against Discrimination and the Uniform Law Commissioners' Model Anti-Discrimination Act: A Comparative Analysis and Evaluation,* 52 Minn. L. Rev. 231, 266, in which Dean Auerbach comments: "Of course, it is a violation of the fourteenth amendment for a state or sub-

Respondents make one argument in this area that must be examined. Citing Federal Civil Rights Act cases, they argue that, at least with respect to a municipality, no liability for discrimination may be imposed unless there is evidence of a pattern or practice of discrimination. We disagree. Municipalities are proper parties to Human Rights Act proceedings involving public services as defined in § 363.01, subd. 19. Liability in those proceedings is premised on the finding of an unfair discriminatory practice. That term is defined in Minn. St. 363.01, subd. 9, as "*any act* described in section 363.03." (Italics supplied.) A single act of discrimination is all that is required to fix liability.

■ We turn now to an examination of the various forms of relief ordered by the hearing examiner. The examiner ordered payment of $100 punitive damages and submission of a letter of apology to Samples by the city and its chief of police.[10] The examiner drew authority for his order from Minn. St. 1971, § 363.071, subd. 2, which provides in part:

"If the panel or examiner finds that the respondent has engaged in an unfair discriminatory practice, the panel or examiner shall make findings of fact and conclusions of law, and shall

---

division thereof to engage in any of the practices now declared to be unfairly discriminatory by section 363.03(4) of the State Act. But in the absence of section 363.03(4), the only remedy available to the person discriminated against is a lawsuit which such person would have to initiate himself. Such discriminatory practices are now subject to the administrative, adjudicatory, and remedial provisions of the State Act. This furnishes an additional, and needed, weapon in the battle against discrimination in the furnishing of public services. It also helps to augment the authority and responsibility of the Commissioner of Human Rights for antidiscrimination policy within the State Administration."

[10] The examiner also ordered the city and the police department to create an internal system of review for complaints of racial discrimination against police employees. See footnote 3, *supra.* The district court struck down this portion of the order, and the appellant does not challenge this decision. Upon examination of the record, we agree with the district court that there is no substantial evidence to support such a broad and sweeping order.

issue a preliminary order directing the respondent to cease and desist from the unfair discriminatory practice found to exist and to take such affirmative action as in the judgment of the panel or examiner will effectuate the purposes of this chapter. The panel or examiner may order the respondent to pay the charging party compensatory damages, except damages for mental anguish or suffering, and may also order the respondent to pay the charging party punitive damages in an amount not less than $25 nor more than $100. * * * "

The examiner supported his assessment of punitive damages on a theory of vicarious liability for the acts of the two unidentified police officers. We think the examiner was correct for two reasons. First, § 363.071, subd. 2, broadly allows punitive damages. In order to fulfill the demands of this statute, that section must be interpreted to allow punitive damages against all proper respondents. Any other construction would do violence to what we perceive as the intent of the section to apply the deterrent sting of punitive damages to prevent discrimination in all cases regardless of the character of the respondent or the amount of traditional pecuniary damage suffered by the aggrieved party.

Second, Minnesota tort law, insofar as it is relevant in ascertaining the meaning ascribed by legislators to a remedy of "punitive damages" in the statute, has authorized vicarious liability for punitive damages. The leading case is Schmidt v. Minor, 150 Minn. 236, 184 N. W. 964 (1921).[11] In that case this court held, in an action for damages for assault and battery, that when an employee is liable for punitive damages, such damages may also be recovered from his employer if the employee was acting within the scope and course of his employment. It cannot be disputed that the acts of the police officers in the instant case were within their employment and sufficiently willful and malicious to sub-

[11] See, also, Anderson v. International Harvester Co. 104 Minn. 48, 116 N. W. 101 (1908); Peterson v. Western Union Telegraph Co. 75 Minn. 368, 77 N. W. 985 (1899); 5B Dunnell, Dig. (3 ed.) § 2553.

ject them to punitive damages.[12] Therefore, under the rule of Schmidt and its predecessors, the city as employer is also subject to punitive damages.[13]

One further argument deserves brief attention. Respondents maintain that Minn. St. 466.04 of the Tort Liability Act governing municipalities precludes the recovery of punitive damages. That section, however, provides only that: "No award for damages *on any such claim* shall include punitive damages." (Italics supplied.) The claim referred to is a claim under the Tort Liability Act, not a proceeding for an unfair discriminatory practice under the Human Rights Act. It is not disputed that the city is a proper party to a human rights proceeding, and there is nothing in the Human Rights Act to indicate an intent that cities are to be distinguished from other respondents in regard to the $25 to $100 punitive damage liability.[14]

While no Minnesota case has extended the Schmidt rule to supervisory employees or department heads such as police chiefs, we think that such an extension might comport with the central policy behind vicarious liability in this area—to induce supervi-

---

[12] See, Benson Co-op. Creamery Assn. v. First Dist. Assn. 276 Minn. 520, 528, 151 N. W. 2d 422, 427, 152 N. W. 2d 182 (1967); McCormick, Damages, § 79; and 5B Dunnell, Dig. (3 ed.) §§ 2539 and 2540, for statements of the general test for punitive damage liability.

[13] The same response applies to the holding of this court that punitive damages are not recoverable against municipalities unless expressly authorized by statute. Desforge v. City of West St. Paul, 231 Minn. 205, 42 N. W. 2d 633, 19 A.L.R. 2d 898 (1950). In our view, the Human Rights Act provides sufficient statutory authorization.

[14] While the major legal encyclopedias report a split of authority on the issue of vicarious liability for punitive damages, 25 C.J.S., Damages, § 125, 22 Am. Jur. 2d, Damages, §§ 257 and 258, Prosser states that the majority of jurisdictions follows the Schmidt rule in making the employer liable. Prosser, Torts, § 2, p. 12. The alternative rule requires some act on the part of the employer to fairly connect him with the employee's acts, e. g., direct participation, forehand knowledge, ratification, etc. See, Restatement, Torts, § 909, and Tentative Draft No. 19, Restatement, Torts 2d, § 909, and Restatement, Agency 2d, § 217C.

sory employees to carefully train, supervise, and discipline their employees.[15] However, there should be some showing that no reasonable effort had been made by such employees to avert discrimination by personnel under their supervision. The imposition of punitive damage liability on those responsible for performing these functions is likely to result in greater attention throughout departments to the important social policy of freedom from discrimination. Consistent with this policy, however, vicarious liability for punitive damages should be imposed only against those in ultimate supervisory authority at the time of the incident in question for only they can fairly be held responsible for performance of the full range of functions listed above. The record before us is devoid of any evidence showing that either of the chiefs of police named authorized or approved discriminatory practices or were aware of any such practices and did nothing to prevent future occurrences. Therefore, we hold that the examiner's award of $100 punitive damages be reinstated as it applies to the City of Minneapolis but not to former Chief Basil Lutz nor to succeeding Chief Gordon Johnson.

■ The hearing examiner also ordered the city and its chief of police to write a letter of apology to Randolph Samples. Our reading of Minn. St. 1971, § 363.071, subd. 2, convinces us that this type of relief was unauthorized. Subdivision 2 directs that the examinor *"shall issue"* a cease and desist order and an order "to take such affirmative action" as in the examiner's judgment will further the purposes of the act. The subdivision later provides for compensatory and punitive damages to aggrieved parties. While the issue is not free from doubt, we are of the opinion that a mandatory order to take affirmative action is designed to correct existing or possible future discrimination. This con-

---

[15] For an excellent discussion of the competing policies in this area, see, Morris, *Punitive Damages in Tort Cases,* 44 Harv. L. Rev. 1173, 1199. Additionally, there should be some evidence that the supervising officer authorized and approved discriminatory practices or being aware of them, failed to take reasonable measures to prevent them.

struction satisfactorily explains three aspects of the subdivision: (1) The provision that affirmative action must be ordered in each case (as contrasted with the later provision that punitive and compensatory damages *may* be ordered); (2) the association of the cease and desist order with the affirmative action order; and (3) the separation of the sentence concerning those orders from the provisions granting compensatory and punitive damages. We believe the legislature intended affirmative action orders to be used to eliminate existing and continuing discrimination, to remedy the lingering effects of past discrimination, and to create systems and procedures to prevent future discrimination.

A letter of apology is not a proper means to effectuate any of these purposes. The writing of such a letter is calculated to humiliate and debase its writer and will succeed in producing only his resentment—an emotion not particularly conducive to the advancement of human rights. The Pennsylvania courts recently struck down, under a statutory provision similar to ours, an order for a letter of apology in Alto-Reste Park Cemetery Assn. v. Pennsylvania Human Relations Comm. 7 Pa. Cmwlth. 203, 298 A. 2d 619 (1972), affirmed, 453 Pa. 124, 306 A. 2d 881 (1973). In that case, the commission granted relief because a cemetery had refused to bury a black man. While the case is not exactly in point because the commission there ordered a formal *public* letter of apology, we think the comments and reasoning of the judges apply as well to the instant case. The intermediate appellate judge noted in striking down the order:

"* * * I recognize that the Act [Pennsylvania Human Relations Act] allows the Commission to require affirmative action to implement its effectiveness but a requirement such as we have before us * * * could well lead to varied, arbitrary and even oppressive orders under the guise of giving proper effectuation of the purposes of the Act." 7 Pa. Cmwlth. 209, 298 A. 2d 623.

When the Pennsylvania Supreme Court affirmed the lower court,

Justice Pomeroy concurred, expressing the following opinion on letters of apology:

"As to the remedy ordered by the Commission, I add my thought that the Commission, an agency of democratic government, is without power to order the giving of a public apology. An apology is a communication of the emotion of remorse for one's past acts. To order up that particular emotion, or any other emotion, is beyond the reach of any government; to assert the contrary is to advocate tyranny. If, perchance, the Commission, in ordering a public manifestation of remorse, should be indifferent as to whether remorse in fact exists but instead should desire only the outward act, then it would be either extracting a lie from those willing to lie ('I'm sorry', but I'm really not) or asking the courts of this State to hold in contempt those who will not lie ('I'm not sorry and I will not say that I am'). Given the choice, I would rather hold in contempt the former, not the latter. But in my view the Commission should eschew purporting to order the expression of an emotion, whether or not the emotion is in fact entertained by the one so ordered." 453 Pa. 140, 306 A. 2d 891.

The order of the district court is (1) reversed as to its conclusion that no unfair discriminatory practice occurred; (2) reversed as to that portion of its order setting aside the examiner's award of $100 punitive damages against the city of Minneapolis; (3) affirmed as to that portion of the order setting aside the examiner's award of $100 punitive damages against the police chiefs; (4) affirmed as to those portions of its order setting aside the examiner's orders for a letter of apology and a system of internal review. The case will be remanded for entry of an order in accordance with this opinion which of necessity is based on the record placed before us.

Affirmed in part, reversed in part, and remanded.