Lori Diane **GREINER**, Appellant,

v.

**CITY OF CHAMPLIN, a Minnesota Municipal Corporation; Gene H. Kulander, Champlin Chief of Police; Allen Bruns, Champlin Police Sergeant; Robert L. Penney, Champlin Police Officer; Jolene Sander, Champlin Police Officer, Appellees.**

Mona Belle **WULFF**, Appellant,

v.

**CITY OF CHAMPLIN, a Minnesota Municipal Corporation; Gene H. Kulander, Champlin Chief of Police; Allen Bruns, Champlin Police Sergeant; Robert L. Penney, Champlin Police Officer; Jolene Sander, Champlin Police Officer, Appellees.**

Kimberly Jo **SALO**, Appellant,

v.

City of Champlin, a Minnesota Municipal Corporation; Gene H. Kulander, Champlin Chief of Police; Allen Bruns, Champlin Police Sergeant; Robert L. Penney, Champlin Police Officer; Jolene Sander, Champlin Police Officer, Appellees.

Joanne Elaine **HYATT**, Appellant,

v.

City of Champlin, a Minnesota Municipal Corporation; Gene H. Kulander, Champlin Chief of Police; Allen Bruns, Champlin Police Sergeant; Robert L. Penney, Champlin Police Officer; Jolene Sander, Champlin Police Officer, Appellees.

Shelly Marie **OTT**, Appellant,

v.

City of Champlin, a Minnesota Municipal Corporation; Gene H. Kulander, Champlin Chief of Police; Allen Bruns, Champlin Police Sergeant; Robert L. Penney, Champlin Police Officer; Jo-

lene Sander, Champlin Police Officer, Appellees.

Robin Ann BARBEAU, Appellant,

v.

CITY OF CHAMPLIN, a Minnesota Municipal Corporation; Gene H. Kulander, Champlin Chief of Police; Allen Bruns, Champlin Police Sergeant; Robert L. Penney, Champlin Police Officer; Jolene Sander, Champlin Police Officer, Appellees.

No. 93–2044.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 15, 1993.

Decided July 5, 1994.

Robert A. Hill, Minneapolis, MN, argued, for appellant.

Jon K. Iverson, Minneapolis, MN, argued (Paul D. Reuvers, on the brief), for appellee.

Before MORRIS SHEPPARD ARNOLD, Circuit Judge, JOHN R. GIBSON,* Senior Circuit Judge, and WOODS,** District Judge.

JOHN R. GIBSON, Senior Circuit Judge.

Homeowners Lori Greiner and Mona Wulff and several of their guests[1] appeal from a summary judgment entered against them in their civil rights suit against police officers[2] who came to the Greiner and Wulff house in response to a neighbor's complaint about a loud party, which degenerated into a donnybrook, ending in arrest of all the plaintiffs. Greiner, Wulff and their guests sued the police officers for federal civil rights violations and various state law torts. One guest, Shelly Ott, also brought a Minnesota Human Rights Act claim. The district court held the federal claims were barred by qualified immunity and the state claims by official immunity. It held that the Minnesota Human Rights Act claim was not supported by evidence sufficient to make a prima facie case. Accordingly, the court entered summary judgment for the defendants. *Greiner v. City of Champlin*, 816 F.Supp. 528 (D.Minn. 1993). On appeal, the plaintiffs argue that the qualified and official immunity holdings were wrong and that there was prima facie evidence of a Minnesota Human Rights Act claim. We affirm the judgment of the district court, with the exception of its disposition of Ott's claim under the Minnesota Hu-

---

* The HONORABLE JOHN R. GIBSON was Circuit Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted, and took senior status on January 1, 1994, before the opinion was filed.

** The HONORABLE HENRY WOODS, United States District Judge for the Eastern District of Arkansas, sitting by designation.

1. The guest-plaintiffs are Kimberly Salo, Joanne Hyatt, Shelly Ott and Robin Barbeau.

2. The police-officer-defendants are Sgt. Allen Bruns, Robert L. Penney and Jolene Sander.

man Rights Act, which we reverse and remand.

The parties' accounts of the facts differ in many important respects. Because of the procedural posture of the case, we recite the facts in the light most favorable to the plaintiffs, but also take into account factual admissions from the plaintiffs' depositions. *See Camfield Tires, Inc. v. Michelin Tire Corp,* 719 F.2d 1361, 1364–66 (8th Cir.1983).

Greiner and Wulff own a house together in Champlin, Minnesota. On the evening of July 13, 1991 they had about twenty people over for a back-yard barbecue. They offered beer and schnapps to drink, and some of the guests drank a substantial amount of beer ("seven to 12"; "six to eight minimum"; "eight or nine beers") as well as schnapps over the course of the evening. Shortly after one o'clock in the morning, a neighbor called the police complaining of noise from the party. Officer Jolene Sander responded to the call with Reserve Officer Nozzarella. Sander spoke to Greiner and Wulff, telling them to quiet the party down. Sander told them that if the police got a second complaint, they would issue a citation and break up the party. Sometime before 2:00 a.m., the police received a second call from the neighbor, and Sander and Nozzarella returned to the party. Officer Nozzarella stated that before going up to the house, he could hear loud talking and laughter. Sergeant Allen Bruns and Officer Robert Penney arrived in another car.

When the police arrived the second time, many of the guests had already left. As Sander approached the house, flashlight in hand, she shone the flashlight in Barbeau's face and left it there even after Barbeau asked her politely to move the light. Officer Bruns began telling the guests to leave. However, the guests refused to leave and instead began telling the police to leave. According to Lori Greiner, "[A] lot of the [guests] moved from the backyard up into the garage [where the police were] and people were starting to say that [the police] were trespassing, that they had no right to be there." Several of the guests told police that they would not leave because they had been invited, variously, to "spend the eve-

ning," to "stay all night," to "stay," and at least one said she would not leave because she was drunk. Shelly Ott told police "she wasn't going to fucking leave."

Barbeau advised the other partygoers that they could avoid having to obey the police orders by going in the house: "I was telling everybody to get in the house because, to my knowledge, once we were in the house there wasn't anything they could do to us." Barbeau testified:

Q: Do you remember the officers telling you not to go in the house?

A: Yes.

Q: But that was ignored as well?

A. Yes.

Ott states she was not aware of instructions not to enter the house:

Q: Did the officers say anything to you when you came back in [the house]?

A: Absolutely not. They didn't say a word.

All the guests made it into the house, except for Joanne Hyatt.

Meanwhile, in the garage Officer Penney and Joanne Hyatt argued, as he told her to leave and she refused, first saying she was waiting for a ride and later changing her mind and saying she was going in the house to spend the night. Hyatt admits she had been quite vocal earlier, telling police they were trespassing and that if they wanted to talk to the partygoers, they could go out in the street to do so. As Hyatt began to go inside the house despite Officer Penney's orders, she says that he restrained her with a chokehold. She tried to pull away from Penney, saying "Get your fucking hands off me." Hyatt says Penney threw her down, knelt on her and handcuffed her.

As this happened, Sergeant Bruns announced that the police were coming inside the house and opened the door of the house. When the door opened Shelly Ott saw Hyatt, her roommate, face down on the pavement, handcuffed. Ott became "upset." As Ott ran down the stairs to the door, Sergeant Bruns grabbed Ott at the door and tried to pull her out; Robin Barbeau, Kim Salo and Karen Johnson (another guest) tried to pull

Ott back into the house. Ott said she called Bruns a "fucking son of a bitch" twice at that point. Barbeau described the struggle: "Shelly was kind of moving around a little bit too much. She wasn't swinging or poking or pushing, but she was vocal and at that point she was swearing." In the struggle, Ott's shirt was pulled over her head. Bruns handcuffed her and she asked that her shirt be pulled down. To this Bruns reportedly said: "Hey, we are all women here." Later, after she had been taken into the garage, Reserve Officer Nozzarella pulled Ott's shirt back into place.

Barbeau also claims that after Bruns handcuffed her inside the house, Officer Nozzarella brought her to the garage and left her standing in the middle of the garage. Barbeau's finger was injured in the course of her arrest and she was complaining that she believed it was broken. (She was later diagnosed as having a severed tendon). Barbeau's roommate Kim Salo came over to check on Barbeau while Officer Sander was standing there. Barbeau describes Kim Salo as visibly "intoxicated." Officer Sander stated that Salo approached Sander on her "gun side." According to the plaintiffs, Officer Sander then "flung" Salo across the garage and told Lori Greiner to watch Salo. Salo came back (again on Sander's "gun side") and this time Sander "slammed her up against the garage, turned her around and threw her down in the dirt". Sander knelt on Salo's back and handcuffed her.

Police also apprehended and arrested Wulff and Greiner (Greiner in the house, Wulff in the garage). Several other guests sat down on the sofa in accordance with police instructions and were not arrested. During the "chaos" Officer Sander conducted a "protective sweep" search of the house.

The officers loaded the plaintiffs into squad cars. Plaintiffs say that Officer Sander went inside and searched the house again before leaving. Police took the plaintiffs to the police station and booked them on various misdemeanor charges, including public nuisance, disorderly conduct and obstructing legal process.

## I.

The plaintiffs contend that the trial court erred in holding their Fourth Amendment claims under 42 U.S.C. § 1983 (1988) were barred by qualified immunity. Plaintiffs have four discrete theories of Fourth Amendment violations. First, they claim that they had rights under the Fourth Amendment to have and to be houseguests.[3] They claim the police violated these rights in ordering the houseguests to leave. Second, they claim that the police further violated their Fourth Amendment rights when they came in the house with no warrant to arrest Ott, Barbeau, and Greiner. Third, they complain that Sander violated their Fourth Amendment rights by twice searching the house without a warrant. Finally, they allege that the officers violated the Fourth Amendment by using excessive force in arresting Hyatt, Barbeau, Ott and Salo. The district court held that the officers were entitled to qualified immunity on each of these claims. 816 F.Supp. at 543.

The purpose of qualified immunity is to allow public officers to carry out their duties as they think right, rather than acting out of fear for their own personal fortunes. *See generally Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). Toward this end, the rule has evolved that an official performing discretionary functions will generally be immune from liability unless a reasonable person in his position would have known that his actions violated clearly established law. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). An official loses immunity if, first, the law he violated was clearly established at the time of the violation, and second, the applicability of the law to his particular action was evident. *Id.* Not only does qualified immunity protect officials from liability, but it also should spare them the disruption and expense of trial in situations where they have acted reasonably. Accordingly, whether the officer is immune "ordinarily should be decided by the

---

**3.** The plaintiffs also make a one-sentence argument in their opening brief that the First Amend-

ment guarantees the right to have and to be houseguests.

court long before trial," *Hunter v. Bryant,* 502 U.S. 224, ——, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (per curiam), or else much of the benefit of the rule will be lost.

■ Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law. *Creighton v. Anderson,* 922 F.2d 443, 447 (8th Cir.1990). But if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment. *Id.; Gainor v. Rogers,* 973 F.2d 1379, 1384–85 (8th Cir.1992).

We conclude that on the night in question it was not clearly established law that, when a disturbance was underway, officers could not order guests to leave even though they had been invited to spend the night. The plaintiffs argue that they had Fourth Amendment privacy rights and First Amendment associational rights in being and having houseguests, which the officers could not interfere with.[4] Plaintiffs cite *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), and *Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), as authority for the proposition that they had a constitutional right to have and to be houseguests. It is obvious that neither of these cases directly governs the claim plaintiffs make. *Olson* is a warrantless arrest case, and though it concludes that houseguests have standing to assert Fourth Amendment rights in the case of an unlawful arrest, it does not by any stretch of the imagination state an absolute right to have friends stay in one's house regardless of any countervailing state interest. *Roberts* hurts the plaintiffs more than it helps them, since it establishes an indeterminate spectrum for associational rights based on intimacy, without indicating with any precision where houseguests might fall on that spec-

trum. 468 U.S. at 620, 104 S.Ct. at 3250–51. The district court reasoned that Greiner, Wulff, and their guests did not have the sort of "deep attachments and commitments similar to familial relationships." 816 F.Supp. at 538. Indeed, Greiner and Wulff met some of the guests for the first time the night of the party. The district court concluded that these relationships were not on the highly protected end of the *Roberts* spectrum. *Id.*

While it is obvious that citizens have some interest in having houseguests, the crucial question is what level of government interest can justify government interference with the houseguest relationship. In *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), the Supreme Court upheld a zoning regulation limiting land use to one-family dwellings and thereby prohibiting more than two unrelated persons from living together. The Court said the ordinance did not compromise fundamental rights of privacy or association and therefore the Court applied a "rational basis" review to the ordinance. *Id.* at 7–8, 94 S.Ct. at 1540–41. *Cf. McKenna v. Peekskill Housing Auth.,* 647 F.2d 332 (2d Cir.1981) (holding public housing project's requirement that houseguests register with management infringed on fundamental rights of association and privacy, and could only be justified if it was the least restrictive means in light of the interests served). *Boraas* may not dictate the result on the merits in this case, but it shows that it was at least *arguable* that the police could interfere with a houseguest relation if their action was rationally related to a legitimate governmental interest.

We grant that police could not have interfered with the houseguest relation arbitrarily, without some valid governmental interest in doing so. However, the facts do not fairly present that situation. The record shows there were two complaints, that the police had already delivered a warning, that an outside party was going on around 2:00 a.m.,

---

4. We deal with the Fourth Amendment claim of a right to have houseguests as a matter of grace, since our perusal of the record indicates that plaintiffs failed to raise this *particular* Fourth Amendment theory in the district court, *see Clarke v. Bowen,* 843 F.2d 271, 273 (8th Cir. 1988). The plaintiffs also failed to raise the First Amendment issue in their opening brief on appeal, *see Weiner v. Eastern Arkansas Planting Co.,*

975 F.2d 1350, 1357 n. 6 (8th Cir.1992) (arguments must be raised in appellant's opening brief), except in a one-sentence footnote that does not inform the court adequately of the contours of their argument. Since these claims are closely related and one or the other of them was raised at the necessary times, we consider them despite the fact that, taken separately, they were not properly preserved.

and that it involved some level of noise (even granting a dispute about how much noise). These facts give rise to some governmental interest in dispersing the crowd in order to restore order and quiet during hours most citizens devote to sleep.[5] We emphatically do not consider how we would resolve the relative interests of the city and the guests on the merits, if that issue were before us. We do, however, hold that plaintiffs have not shown that it was clearly established on the night of their party that their rights were paramount over the governmental interest in dispersing them. Therefore, the defendants are entitled to qualified immunity on this claim.

■■■ The plaintiffs' second claim is that the officers violated their clearly established Fourth Amendment rights by entering the house to arrest fleeing partygoers. It was clearly established on the night of the party that police could not enter the house to make warrantless arrests unless there were probable cause and exigent circumstances. *Duncan v. Storie*, 869 F.2d 1100, 1102 (8th Cir.), *cert. denied*, 493 U.S. 852, 110 S.Ct. 152, 107 L.Ed.2d 110 (1989). As to those arrested outside the house (Wulff, Hyatt and Salo), the police must simply show that they had probable cause to make the arrests. *Id.*

The question, as in *Anderson v. Creighton*, is not whether there were actual probable cause and exigent circumstances, but whether the officers could reasonably have thought so. 483 U.S. at 641, 107 S.Ct. at 3039–40. "[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable. The same is true of their conclusions regarding exigent circumstances." *Id.* (citation omitted).

Having already established that the officers could reasonably have believed their dispersal order to be valid, we have no diffi-culty in holding the police could have thought there was probable cause for the arrests. The officers were there on a second call for a loud party at almost 2:00 a.m., and themselves heard loud talking, giving them probable cause to arrest the homeowners for maintaining a public nuisance. *See* Minn.Stat. § 609.74 (1992). The houseguests were resisting the dispersal order. These facts are sufficient to show "arguable probable cause," *see Myers v. Morris*, 810 F.2d 1437, 1455 (8th Cir.), *cert. denied*, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987), and thus support a finding of immunity.

■■■ The showing of exigent circumstances justifying the officers' entry into the house in pursuit of Greiner, Barbeau and Ott is a much closer question. *Welsh v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), casts serious doubt on the question of whether a warrantless home arrest for a misdemeanor will ever be deemed reasonable. In *Welsh*, the police entered a house without a warrant to arrest Welsh for drunken driving, which, on first offense, was a noncriminal violation, punishable by a maximum fine of $200. *Id.* at 746, 104 S.Ct. at 2095–96. The only exigent circumstance was that Welsh's blood alcohol level would dissipate during the delay required to obtain a warrant. *Id.* at 753, 104 S.Ct. at 2099. In holding the entry of Welsh's home unlawful, the Supreme Court held that the gravity of the offense for which a person is arrested has a crucial bearing on whether circumstances were exigent enough to justify a warrantless home arrest. The Court stated: "[I]t is difficult to conceive of a warrantless home arrest that would not be unreasonable under the Fourth Amendment when the underlying offense is extremely minor." *Id.* at 753, 104 S.Ct. at 2099. On the other hand, the Court declined to say flatly that there could be no warrantless home arrest for a misdemeanor: "Because we conclude that, in the circumstances presented by this case, there were no exigent circumstances sufficient to justify a warrantless home entry, we have no occasion

---

5. In at least the case of Joanne Hyatt, there is the added twist that the invitation to spend the night was apparently given and accepted *after* the police order to disperse. It is doubtful whether a police order, valid when given, could be trumped by a few words between homeowner and friend, creating a houseguest relation on the spot.

to consider whether the Fourth Amendment may impose an absolute ban on warrantless home arrests for certain minor offenses." *Id.* at 749 n. 11, 104 S.Ct. at 2097. Courts have differed in their views of how much uncharted territory *Welsh* leaves open. *Compare Reardon v. Wroan*, 811 F.2d 1025, 1028 (7th Cir.1987) ("at a minimum, exigent circumstances do not exist when the underlying offense is minor, typically a misdemeanor") *with United States v. Mayo*, 792 F.Supp. 768, 771–72 (M.D.Ala.1992) (exigent circumstances existed in warrantless home arrest for misdemeanor of "menacing," which was actually a serious crime) *and Malachowski v. City of Keene*, 787 F.2d 704, 714 (1st Cir.) (qualified immunity available for warrantless entry of home to arrest on charges of disorderly conduct), *cert. denied*, 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986).

Significantly, even after *Welsh*, the state courts in the jurisdiction where these arrests took place have approved warrantless home arrests for misdemeanors where justified by hot pursuit. *See, e.g., Pahlen v. Commissioner of Public Safety*, 382 N.W.2d 552 (Minn.Ct.App.1986). In *Pahlen*, the Minnesota Court of Appeals quoted an earlier Minnesota Supreme Court case, *State v. Koziol*, 338 N.W.2d 47, 48 (Minn.1983), which said: "[A] person may not defeat a warrantless arrest which has been set in motion by entering into his dwelling." *Pahlen*, 382 N.W.2d at 554.[6] This is exactly what happened here, when Barbeau told her friends to get inside, because the police could not follow them there. Though Ott's testimony indicates she was not aware of the order not to enter the house, Barbeau flatly states that she was aware of the order and ignored it. Since the qualified immunity question requires us to assess the facts as they appeared to the officers, the admitted exchange with Barbeau shows that the officers had reason to believe the plaintiffs were defying their orders.

Putting firmly to one side the merits of whether the home arrests were constitutional, we cannot say that only a "plainly incompetent" policeman, *see Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986), could have thought them permissible at the time. Accordingly, the officers are entitled to qualified immunity on this claim.

■ Once we have determined that qualified immunity applies to the home arrests, the protective sweeps are also brought within its protection. Officer Sander testified that she did not know who else was in the house other than those guests on the sofa and those under arrest; that the situation was "chaotic"; "everyone was aggressive towards us"; and that she "did a quick sweep to make sure no one else was in the house for an officer safety issue." This was at least arguably permissible under *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). Therefore, Sander is protected by qualified immunity. The alleged second search was part of the same general fact situation.

■ Finally, the plaintiffs attack the district court's holding of qualified immunity on their Fourth Amendment excessive force claim under *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). They base this claim on their allegations that in the struggles with police: (a) a tendon in Barbeau's finger was severed; (b) Ott's shirt was pulled over her head; (c) Salo was thrown headfirst into a dirt pile; and (d) Hyatt was "place[d] on her knees and violently handcuff[ed] when she ha[d] not offered any resistance to the arresting officer."

■ Claims that law enforcement officers used excessive force in making an arrest are analyzed under the Fourth Amendment, and the test is whether the amount of force used was objectively reasonable under the particular circumstances. *Graham*, 490 U.S. at 394–96, 109 S.Ct. at 1870–72. The test includes allowance for the fact that "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary." *Id.* at

---

**6.** Although we do not generally rely on unpublished opinions, *see* Eighth Circuit Rule 28A(k); we take note that the Minnesota Court of Appeals recently followed *Pahlen* in *Erickson v. Commissioner of Public Safety*, No. C2–92–507, 1992 WL 203273 (Minn.Ct.App.1992) (unpublished).

397, 109 S.Ct. at 1872. " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' violates the Fourth Amendment." *Id.* at 396, 109 S.Ct. at 1872 (citation omitted).

■ When an arrestee flees or resists, some use of force by the police is reasonable. *Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1082 (8th Cir.1990). Barbeau and Ott fled into the house, trying to escape arrest. Hyatt, Ott, and Barbeau concededly struggled with the police. The incident Salo complains of occurred after she had been pushed out of the way once and disregarded a warning. In the cases of Hyatt, Ott and Salo the lack or minor degree of any injury is also relevant. *Foster,* 914 F.2d at 1082. In Barbeau's case, the alleged severed tendon is more serious, but Barbeau specifically described how she tried to pull Shelly Ott from the doorway, struggled to shut the door against Sergeant Bruns, and then clung to the door "getting a grip so that—leverage to get away from Sergeant Bruns," who had hold of her arm. Under these circumstances, the fact that her finger was hurt is well enough explained by her own actions and does not create a material issue of fact as to whether police used excessive force.

The district court correctly held the officers were protected from the plaintiffs' section 1983 claims by the doctrine of qualified immunity.

## II.

■ The plaintiffs also assert state law claims of trespass, assault, battery, false arrest, and intentional infliction of emotional distress, which the district court held were barred by the state law doctrine of official immunity. Under that doctrine, an official performing a discretionary duty can only be liable if he acts maliciously, or if he intentionally commits an act with reason to know that his act was prohibited. *Rico v. State,* 472 N.W.2d 100, 106–07 (Minn.1991). Malice means more than that the officer intentionally did an act which is later determined to be wrong; rather, the officer must have reason to know his act is prohibited. *Id.*

The four acts plaintiffs point to in alleging malice are: (a) Sander shining the flashlight in Barbeau's face; (b) Penney placing Hyatt in a choke-hold; (c) the severing of Barbeau's tendon; and (d) Bruns' refusal to pull Ott's shirt back in place and his comment, "We're all women here."

Pointing a flashlight in Barbeau's face does not tend to prove a malicious act of trespass, assault, battery, false arrest or intentional infliction of emotional distress. As we discussed earlier, the struggles between Hyatt, Ott, Barbeau and the police render it impossible to infer that the police conduct was conscious wrongdoing. As for Bruns' alleged comment, which he denies, it is evident that it does not have bearing on any claim of trespass, assault, battery, or false arrest. The closer question is whether it tends to show malice with reference to intentional infliction of emotional distress. Bruns' conduct must be considered in two respects. We have already commented that the action in pulling Ott's tee-shirt over her head occurred during the free-for-all and her resistance of arrest. This was the extent of the district court's ruling, and we conclude there was no error. It was only after she had been handcuffed and placed on her knees in the garage that she made the request to Bruns that her shirt be put back in place, and he allegedly made the comment. We believe this to be a close issue, but in light of the emotional nature of the extended period of events that proceeded it, we cannot conclude that it can be said to show malice.

## III.

■ Finally, Shelly Ott appeals from the district court's grant of summary judgment against her on her claim under the Minnesota Human Rights Act, Minn.Stat. § 363.03 subd. 4 (1991). Under this statute, Ott must show that she was treated differently with respect to public services than others similarly situated except for gender, or that treatment of her was so different from what would be expected that discrimination is the probable explanation. *City of Minneapolis v. Richardson,* 307 Minn. 80, 239 N.W.2d 197, 202 (1976). She claims that Bruns' actions in pulling her shirt over her

head, refusing to pull it down, and saying, "We are all women here" establishes a prima facie case, because it was so at variance with what could be expected that it points to gender discrimination. The fact that Ott's shirt was pulled out of place does not support any inference of discrimination in light of the struggle between Ott and Bruns and the pandemonium that prevailed, according to all accounts. As for the comment, again, when we consider the second phase of the shirt incident with Ott, we encounter more serious difficulties—difficulties which were not addressed in the district court's opinion.

The facts were clear that Ott was handcuffed and placed in the garage on her knees. As soon as she was handcuffed, which she says was in the house, she asked Bruns to pull her shirt down, and he made the statement, "We are all women here". She was upset and felt humiliated. There was a conflict in testimony as to how long a time elapsed between her request that her shirt be put into place, and the time that Officer Nozzarella put it back in place. While the issue is far from clear, and much affected by issues of credibility that may not be resolved on summary judgment (such as Ott's admission that she was between sober and drunk, and had drunk at least six or eight beers), we conclude that her treatment in this respect was so different from what could be expected as to give rise to an inference of gender discrimination. We conclude that it is a jury issue whether the delay in putting Ott's shirt back into place after she had been handcuffed and had requested to have her clothing rearranged makes a prima facie case of discrimination on the basis of gender, with the particular embarrassment and humiliation that would be expected to result to women from such treatment.

We thus must remand the alleged Human Rights Act violation to the district court for further consideration. Further proceedings should include consideration of whether the court should retain pendent jurisdiction over this sole surviving state law issue.

### IV.

We affirm the judgment of the district court, except that we remand Ott's claim under the Minnesota Human Rights Act for gender discrimination in connection with Bruns' failure to replace her tee-shirt.