**Joseph LAMB, Petitioner, Appellant,**

v.

**VILLAGE OF BAGLEY, Respondent, State of Minnesota, by Marilyn E. McClure, Commissioner, Department of Human Rights, Respondent.**

No. 51923.

Supreme Court of Minnesota.

Sept. 25, 1981.

Rehearing Denied Nov. 13, 1981.

Treuer & Day and Margaret Seelye Treuer, Bemidji, for petitioner, appellant.

Ekvall & Rasmussen and James R. Wilson, Bagley, for Village of Bagley.

Warren Spannaus, Atty. Gen. and Mark Levinger, Sp. Asst. Atty. Gen., St. Paul, for State of Minnesota.

SIMONETT, Justice.

We granted a petition to review the decision of a three-judge district court panel affirming the decision of the hearing examiner that respondent village did not violate Minn.Stat. § 363.03, subd. 1(2) (1980), by discriminating against one of its police officers on the basis of race, nor did the city invoke unfair reprisals against the police officer contrary to subdivision 7 of the same section. We reverse.

Appellant Joseph Lamb,[1] who is half Indian, worked from June 1974 through May 1975 for the Police Department of the Village of Bagley. During this 1-year period the department had four members, Chief Francis "Fritz" LaRoque, Tom Neeland, Norvald Anderson and Lamb. LaRoque was over one-half Indian. Neeland was five-eighths Indian and Anderson was white. In March 1975, during this 1-year period, Anderson left the force and was replaced by David Rivera, part Spanish and part white. After Lamb left in May 1975, he was replaced by a white officer.

LaRoque was extremely abusive to Lamb. He addressed Lamb as a "damn Indian." He called Lamb a "big fat Indian," a "dumb

---

1. Procedurally, the Minnesota Commissioner of Human Rights is a named respondent but submitted a brief on behalf of, and shared argument time with, appellant. This posture was no doubt motivated by *Dakota County Abstract Co. v. Richardson*, 312 Minn. 353, 252 N.W.2d 124 (1977), in which we held that the Department of Human Rights may not appeal from a decision of its own hearing officer. After that decision, however, the legislature amended Minn.Stat. § 363.072, subd. 1, to allow the com-

missioner, in addition to any person aggrieved, to seek judicial review of a final decision of the department. Act of June 2, 1977, ch. 408, § 5, 1977 Minn.Laws 951, 956. It follows that if the commissioner is unsatisfied with the result of review in the district court, the commissioner may appeal to this court pursuant to Minn.Stat. § 363.10 (1980).

Police Chief Francis LaRoque died before the Department of Human Rights hearing and was dismissed as a respondent.

Indian," and a "fat dumb nigger." The police log is replete with derogatory remarks, some about Lamb's weight, some stories about his association with women, and at least one reference to Lamb as a "big, fat black nigger."

Lamb was paid $475 a month during the course of his employment; his predecessor was paid $570 a month and his successor, a white officer, was started at $540 a month. Lamb was promised a $125 clothing allowance but never received it; all other officers did.

Chief LaRoque spread rumors about Lamb chasing women and on one occasion called Lamb's wife to report that Lamb was with another woman at that moment. Lamb was at home. LaRoque started rumors that Lamb and several Indian friends were deer shining. He required Lamb and Neeland to move into town as a condition of employment but did not require the non-Indian police officers to do so; no explanation was offered by the village for this disparity in treatment. The two Indian officers were ordered to lose weight under threat of suspension, while Lamb's successor, a non-Indian who weighed 300 pounds, was not required to go on a diet. Neither was this disparity of treatment explained by the village. LaRoque disciplined Lamb and Neeland more severely than others on the force and more severely than was warranted. One night when Lamb was working late, the Chief remarked to him, "You damn Indians should be home in bed where you belong," and remarked at other times that Indians "should stay on the reservation."

It is clear from the record that Lamb was subjected to humiliating and discriminatory treatment by LaRoque. The hearing examiner agreed, describing LaRoque's actions as "terribly abusive activities." The hearing examiner, however, found this abuse was not racially motivated against Lamb as an Indian but instead that this treatment was due to his "position at the bottom of the pecking order in the police department because of his education, his lack of law enforcement experience, and his weight."

As we view this record, appellant Lamb presented a *prima facie* case of unfair employment practices consisting of discrimination, not based on a bona fide occupational qualification, "against a person with respect to his * * * compensation, terms, upgrading, conditions, facilities, or privileges of employment." Minn.Stat. § 363.03, subd. 1(2)(c) (1980). In *Danz v. Jones*, 263 N.W.2d 395 (Minn.1978), we held, consistent with *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), that the complainant has the initial burden of establishing a *prima facie* case of discrimination. *Danz*, 263 N.W.2d at 399. This *prima facie* case is established upon a showing of unequal treatment. Discriminatory intent need not be proved at this stage. The burden then shifts to the defendant to articulate some legitimate nondiscriminatory reason for disparity in treatment. If the defendant comes forward with sufficient proper rebuttal evidence, the complainant must then carry the ultimate burden of persuasion to show, by a preponderance of the evidence, that the legitimate reasons offered by the defendant are not so, but only a pretext for discrimination. In carrying the burden of persuasion, the complainant may succeed either by persuading the trier of fact that it is more likely the defendant was racially motivated or that the defendant's proffered explanation is unworthy of credence.

In rebuttal the village introduced evidence showing Chief LaRoque abused others in his department as well as Lamb, whites as well as Indians; that Lamb's successor, a white, was treated as badly; that with respect to fights at the municipal liquor store, whites and Indians were treated no differently; that with respect to other complaints, there were permissible grounds for disparity in treatment; and that the police chief lacked professional training and managerial ability and was simply the kind of person who indulged in pranks and horseplay. With respect to Lamb's claim the Chief gave him bad job references, the village introduced evidence to the contrary and the hearing examiner concluded, correctly we agree, there was insufficient evi-

dence of any "reprisal" within Minn.Stat. § 363.03, subd. 7 (1980).

■ Unfortunately, the hearing examiner's decision did not analyze the evidence in terms of the shifting burdens of going forward with the evidence as outlined in *Danz.* We see no need, however, to remand for clarification, as we did in *Danz,* because here the racial epithets, admittedly made, coupled with the admittedly disparate treatment, establish impermissible discrimination as a matter of law. The racially derogatory remarks directed at Lamb establish a *prima facie* case of unequal treatment. The village has come forward with no proof of a legitimate nondiscriminatory reason for that disparity of treatment and evidence of these derogatory remarks reflects upon the basis of the other instances of disparity in treatment.

Recently, in *Thompson v. City of Minneapolis,* 300 N.W.2d 763 (Minn.1980), we upheld the discipline of a city building inspector for a racist remark directed at the American Indian citizens living in the area in which he served. The inspector had been suspended without pay for 90 days because of his violation of a city ordinance prohibiting "wantonly offensive * * * conduct or language towards the public or towards city officers or employees." *Id.* at 765 n. 2. In *City of Minneapolis v. Richardson,* 307 Minn. 80, 239 N.W.2d 197 (1976), we held that the use by police of the word "nigger" in the arrest of a black youth constituted discrimination based on race. "When a racial epithet is used to refer to a person of that race, an adverse distinction is implied between that person and other persons not of his race. The use of the term 'nigger' has no place in the civil treatment of a citizen by a public official." *Id.* at 89, 239 N.W.2d at 203. So here, there is no room for the police chief to abuse a minority employee of his department with racially derogatory terms like "nigger," "dumb Indian" and "fat Indian."

LaRoque's abusiveness to others and his "[lack] of temperament and managerial abilities" do not excuse his more serious personal abuse of Lamb. Overt racist behavior is not to be condoned merely because the person accused has abused others. Although evidence was introduced for the purpose of showing that the statements and actions were made in the context of horseplay, it is clear that much of the abuse was perceived, and was meant to be perceived, as serious and racially motivated.

■ LaRoque's own American Indian background in no way excuses or mitigates unfair discriminatory practices. On that basis the hearing examiner defused LaRoque's racial slurs to the level of only "an expletive." But one minority member has no privilege under the Minnesota Human Rights Act to slur racially another, where, as here, the comments are intended to be demeaning and are not clearly offered and perceived as made in jest. Moreover, the weight placed by the hearing examiner on his finding that LaRoque was over one-half Indian should be discounted. He apparently looked only to LaRoque's genetic background. While this is the standard classification normally employed by non-Indian society, American Indians have traditionally identified themselves culturally, by their relationship to a tribe or people, their life style, and their value system. "Indian racial descent * * * is not enough to prove 'Indianness'." F. Svensson, *The Ethnics in American Politics: American Indians* 4 (1973). *See generally* Funke, *Educational Assistance and Employment Preference: Who is an Indian?* 4 Am.Indian L.Rev. 1 (1976); V. Deloria, *Custer Died for Your Sins: An Indian Manifesto* 189 (1969). Here the record shows that LaRoque left the White Earth reservation as an adolescent. He admitted at deposition that he has maintained no ties with the Indian community; Lamb has sought to maintain those ties.

■ With respect to relief sought, Lamb's complaint asked for reinstatement, that sum of money plus interest which Lamb would have received on the job in the absence of impermissible discrimination, an injunction prohibiting further discrimination against American Indian employees, punitive damages, and such other action as

the hearing examiner deems necessary to effectuate the purposes of the Minnesota Human Rights Act. We remand to the district court with instructions to order the payment to Lamb of compensatory damages, Minn.Stat. § 363.071, subd. 2 (1980), and equitable relief for employment discrimination, *id.* subd. 2(a), in the amount of $905 plus interest, representing the difference between Lamb's salary of $475 per month and two other officers' beginning salaries of $540 per month for 12 months plus the promised clothing allowance of $125. A reasonable attorney's fee should be awarded pursuant to Minn.Stat. § 363.14, subd. 3 (1980).

Reversed and remanded.