Lee SHOCKENCY, Respondent/Relator,

v.

JEFFERSON LINES, Petitioner, Relator/Respondent,

Minneapolis Commission on Civil Rights, Respondent.

Nos. C8–87–1503, C3–87–1577.

Supreme Court of Minnesota.

May 12, 1989.

Charles A. Mays, Leonard, Street and Deinard, Minneapolis, for relator.

Robert J. Brenner, Minneapolis, for respondent.

## OPINION

WAHL, Justice.

Jefferson Lines appeals a decision of the Minneapolis Commission on Civil Rights which was affirmed by the court of appeals. The commission determined that Jefferson had discriminatorily discharged employee Lee Shockency and subjected him to disparate treatment based on race and color. At issue are whether the proceedings before the Commission lacked fundamental fairness and whether the employee proved that racial discrimination underlay his termination. Because we find the evidence insufficient to prove the termination was a pretext for racial discrimination, we reverse.

Respondent Lee Shockency, a black male, was hired by Jefferson in September, 1978, as a bus washer. He held several positions in the shop area during his tenure with the company and was a safety checker at the time of his termination in 1983. During the time he worked at Jefferson, Shockency drank heavily and developed a reputation at work as a heavy drinker. He would regularly finish his shift at Jefferson and go immediately to a nearby bar with several individuals from work. He would drink steadily for seven to eleven hours each night and would occasionally leave the bar at closing time to continue drinking in the Jefferson parking lot until morning. After drinking all night, Shockency would, on occasion, go to the Jefferson lunch room and sleep until his workshift began and his co-workers awoke him. During 1981–83, Shockency attempted to cut back his drinking, but still consumed approximately one case of beer and a fifth of whiskey twice a week.

During his employment at Jefferson, Shockency had a dismal attendance record, amassing 219 tardies or absents from 1979 until his termination. Jefferson maintained a policy of progressive discipline for unexcused absences, ranging from verbal warnings through suspensions to termination. Due to his poor attendance record, Shockency received a final notice letter in May 1983 which stated: "This letter will serve as notice that any further tardiness or unexcused absence will result in termination." After receiving that warning letter, his record improved dramatically until August 14, 1983. On that date, a co-worker called Shockency at home, more than one hour after he was to have reported for work. Shockency's explanation was that he had turned off his alarms, thinking he was turning them on. Shockency arrived at work that day over 2¼ hours late.

A termination meeting was held August 15, 1983. Shockency attended with his union representative. Shop foreman Art Sterrett recommended termination and his supervisor, Mark Knutson, approved the recommendation. Jefferson Lines President Daniel Prins concurred in the termination based on Knutson's recommendation and respondent's personnel file.

Shockency filed a racial discrimination charge with the Minneapolis Department of Civil Rights, on or about November 22, 1983, alleging that a white, chemically dependent employee, Edward Jansen, had been treated more leniently. Hearings before a three-member panel commenced July 29, 1986 and concluded after 17 days of testimony on November 25, 1986. The record remained open until December 22, 1986 to allow closing arguments and a motion for attorney fees to be submitted on briefs. The Commission issued its decision July 9, 1987, finding discriminatory termination on the basis of race and color in violation of Minneapolis ordinances. The Commission awarded $28,071.16 compensatory damages, $5,000 punitive damages, plus $47,706.25 attorney fees.

Both parties appealed the decision and Shockency named the Commission as a party to the appeal. The Commission declined to brief or argue the case since no jurisdictional arguments were raised.

The court of appeals upheld the Commission's finding of discriminatory termination, and the compensatory awards for back pay, punitive damages and mental distress. The court noted that Jefferson had offered no specific evidence to support the allegations of bias and unfairness on the part of the Commission panel. Finally, the court remanded the award of attorney fees for findings on the reasonableness of the attorney hours expended. The appellate court did not award attorney fees for the appeal, finding the motion improperly raised by respondent in his reply brief. We granted review. Consideration of Shockency's motion for attorney fees was stayed pending decision on the merits of the case.

Jefferson alleges that the commission proceedings lacked fundamental fairness, in part because the panel conducted an extensive examination of witnesses testifying on Jefferson's behalf compared to the limited questioning of witnesses testifying for Shockency. Jefferson claims the panel acted in an unbalanced and objectionable manner, exceeding the bounds of proper judicial conduct and becoming advocates for Shockency, which made a fair hearing impossible.

■ The charge of bias is a serious one. We cannot express too strongly the necessity for the commissioners to retain their neutrality in cases being heard before a panel. The question is whether the record in this case demonstrates friction between the commission and an investigated party that would warrant the appointment of an independent hearing examiner. *Minneapolis Police Dept. v. Comm'n on Civil Rights*, 425 N.W.2d 235, 241 (Minn.1988). There is no evidence that the commission was biased against Jefferson nor was there a pre-existing conflict. Mere questioning of witnesses by the panel, without more, does not demonstrate bias or unfairness. Those witnesses questioned most extensively were, except for the adverse psychiatrist, supervisors and administrative personnel of Jefferson Lines. These witnesses had extensive knowledge of many aspects of the case, from company policies on absenteeism and chemical dependency to the application of those policies to their workers, specifically including Shockency. Some of Jefferson's personnel, in particular Mark Knutson, supervisor of the shop foremen, and Thomas Willford, the parts room manager, gave continued evasive and unresponsive answers to the questions put to them by the attorneys as well as by the panel. We note that the seventeen days of hearings extended over four months and produced nearly 2200 pages of transcript, less than 270 of which were due to questions from the commissioners. Our review of the record makes clear that the vast preponderance of testimony was presented by the attorneys and does not lead us to the conclusion that the hearing was unfair.

More troubling than the charge of extensive questioning is the specific questioning of Thomas Willford by a commissioner on the sixteenth day of the hearings, regarding discipline under Jefferson's attendance policy:

Q: Let me finish up by asking you about the letter that you've written to Mr. Anderson stating that you would stretch the guidelines for him in this particular instance on 9–29–83, do you recall that?

A: Yeah, * * * * It says, "As for now I will stretch my guidelines and only give you a written notice."

Q: Okay. Let me just state for the record that you're a white male. Dick Anderson is a white male. Lee Shockency is a black male. When it came to the terms that I've heard you use this evening, you talked about trying to establish a happy medium when it came to Dick Anderson in terms of referencing his tardiness. You talked in terms of closing your eyes. You talked about stretching your guidelines. * * * * Yet I don't hear that same kind of consideration or leniency given in Mr. Shockency['s] case.

    *      *      *      *      *      *

Q: The reason I am asking is because you presented yourself as being consistent and fair but your documents don't substantiate that. Your actions don't substantiate that.

A: That is your opinion.

Q: Clearly it's my opinion. That is why I am trying to ascertain from you if there's some deviation from that.

While we appreciate the panel's desire to obtain clear answers to questions, especially near the end of a lengthy hearing process, this exchange approaches the level of demonstrable friction, which we indicated in *Minneapolis Police Dept.* would warrant the appointment of an independent hearing examiner. 425 N.W.2d at 241. The line between what questioning is reasonably necessary to get clear answers from unresponsive witnesses and what is beyond what is reasonably necessary is, at times, a fine one. Although Jefferson alleges biased questioning of three of its witnesses by the panel, we note the commission found in Jefferson's favor on the facts provided in response to the questioning of which Jefferson complains. The commission found that while Shockency overheard or was the recipient of racial comments or ethnic jokes by Jefferson's workers on a regular basis and that this condition was known and tolerated by the supervisory staff, the evidence was insufficient to establish an oppressive and discriminatory environment at the workplace. The commission did not find discrimination in Thomas Willford's application of the attendance policy, and made no issue of undisclosed or "secret" personnel files. Jefferson itself draws attention to the fact that the commission limited the damages award to Shockency to less than 6% of the amount initially sought. On the record as a whole we affirm the court of appeals and hold the commission proceeding did not lack fundamental fairness.

As to the merits of the case, Jefferson contests the commission's determination of racial discrimination, and asks this court to reverse that determination. Under the Administrative Procedures Act, the final decision of an administrative agency in a contested case may be reversed if the reviewing court finds lack of substantial evidence. Minn.Stat. § 14.69(e) (1988). The court will affirm, however, if in light of the entire record the decision is supported by evidence a reasonable mind would accept as adequate. *Minneapolis Police Dept.*, 425 N.W.2d at 239.

The United States Supreme Court established a three-part analysis for adjudicating disparate treatment claims under Title VII in *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). This court adopted the *McDonnell Douglas* analysis for disparate treatment claims brought under the Minnesota Human Rights Acts in *Danz v. Jones*, 263 N.W.2d 395, 399 (Minn.1978). This three part test requires an employee first to establish a prima facie case of discrimination by a preponderance of the evidence. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the action. *McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. at 1824–25. If the employer can meet this burden, the employee has an opportunity to demonstrate that the employer's articulated explanation is a mere pretext for discrimination. *Id.* at 804–05, 93 S.Ct. at 1825–26.[1]

The commission determined that Shockency had established a prima facie case of discrimination under *E.E.O.C. v. Brown & Root*, 688 F.2d 338 (5th Cir.1982). *Brown & Root* established a four part test, which requires the employee to demonstrate:

1) That plaintiff was a member of a protected group;

2) That there was a company policy or practice concerning the activity for which he or she was discharged;

3) That non-minority employees either were given the benefit of a lenient

---

**1.** Jefferson alleges that the civil rights commission abandoned the *McDonnell Douglas* test and improperly placed the burden of proof on the employer to rebut the inference of racial discrimination. While the commission may not have expressly applied the three-part test, the record is sufficiently thorough to permit effective review within the three step framework. *See Hubbard v. United Press International, Inc.*, 330 N.W.2d 428, 443 n. 15 (Minn.1983).

company practice or were not held to compliance with a strict company policy; and

4) That the minority employee was disciplined either without application of a lenient policy, or in conformity with the strict one.

*Brown & Root*, 688 F.2d at 340–41. The test may be met by demonstrating that a minority employee was discharged and a non-minority employee was retained under apparently similar circumstances. *Id.*

Shockency has met the requirements of this test. As a member of a minority, he was terminated for violating Jefferson's attendance policy. Edward Jansen, a non-minority employee, was also a heavy drinker and had 148 tardies or absences from 1981 until August 1984, comparable to Shockency's record. During Shockency's employment, Jefferson maintained a policy which protected job security for chemically dependent employees who accepted diagnosis and treatment. Supervisors were to become familiar with symptoms of chemical dependency. The policy provided that referral of employees for diagnosis or treatment would be based on unsatisfactory job performance or other significant indications of chemical dependency. President Daniel Prins testified that the company's policy was to persuade or even coerce an employee into accepting treatment. Mark Knutson testified that he had twice given Ed Jansen a choice of getting treatment or losing his job, but had never made the same offer to Shockency, despite his knowledge of Shockency's drinking problem. Art Sterrett, the shop foreman, also knew of respondent's drinking problem, yet never suggested that he get treatment, although he did make such a suggestion to Ed Jansen.

This is disparate treatment of employees in apparently similar circumstances, and culminated in Shockency's termination while Jansen remained with the company for another two years despite continuing attendance problems. As such, Shockency has established a prima facie case of discrimination.

Once a prima facie case of discrimination is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory basis for the termination. Jefferson Lines has articulated such a legitimate, nondiscriminatory basis. Shockency's attendance record, as the commission properly noted, would have justified his dismissal long before he was, in fact, terminated. It falls to Shockency then to demonstrate that the articulated reason is itself merely a pretext for discrimination. An employee may meet the burden of persuasion on the issue of pretext by a preponderance of the evidence either by persuading the trier of fact "that it is more likely the defendant was racially motivated or that the defendant's proffered explanation is unworthy of credence." *Lamb v. Village of Bagley*, 310 N.W.2d 508, 510 (Minn.1981). Evidence of the treatment of the employee and the general policy and practice may also be relevant to a showing of pretext. *McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. at 1825–26.

To show pretext, Shockency submitted evidence to the commission of racially derogatory comments made in the workplace, as well as statistics of Jefferson's minority hiring practices. The commission concluded that the evidence was insufficient to establish the existence of a discriminatory work environment nor did it show an attitude toward minorities which may have affected Jefferson's treatment of Shockency. Consequently, that evidence does not support a finding of racial motivation as required under *Lamb*.

Both the commission and the court of appeals looked to the disparate treatment of Edward Jansen and found that disparity sufficient to demonstrate pretext. We find this to be error. The preponderance of the evidence does not support a determination that Jefferson was racially motivated, or that the proffered explanation was unworthy of credence, as required by *Lamb, supra.*

Of all Jefferson's workers, only Jansen and Shockency were shown to have been disciplined less harshly than their attendance records merited. Jefferson fired at

least two white employees in compliance with the terms of the attendance policy, although their records were considerably better than either Jansen's or Shockency's. Thus, Jefferson's contention that Shockency's termination was due to his attendance record rather than to racial discrimination is not unworthy of credence, since non-minority employees were treated less leniently and were fired in accordance with the policy.

Thus, Shockency's claim of pretext rests solely on the disparate treatment accorded to employee Jansen. Jefferson defends that disparity on the basis that Jansen had admitted to having a drinking problem and was seeking help while Shockency continued to deny that his drinking had any effect on his attendance. It is a close question whether the evidence supports a finding of discriminatory treatment as between Shockency and Jansen alone. Such a finding, however, is based on too narrow an inquiry. It is Jefferson's treatment of all its employees that must be considered. In light of the termination of other, non-minority employees, we hold that Shockency has failed to prove, by a preponderance of the evidence, that the termination of his employment was merely a pretext for racial discrimination. We therefore reverse the commission and the court of appeals on the issue of discriminatory discharge.

We need not address the reasonableness of the damage award except to note that because the employer prevails in this case, attorney fees may not be collected by the employee.

Reversed.

KEITH, J., took no part in the consideration or decision of this case.

POPOVICH, C.J., specially concurs and files an opinion in which YETKA and KELLEY, JJ., joined.

POPOVICH, Chief Justice (concurring specially).

While I concur in the majority's holding that Shockency failed to prove by a preponderance of the evidence the reason given for termination of his employment was merely a pretext for racial discrimination, I must respectfully disagree with the portion of the court's opinion holding the proceeding was fundamentally fair. By extensively questioning witnesses and expressing his opinions about the testimony, one of the members of the Commission panel exceeded the bounds of his adjudicatory role and substantially compromised the fairness of the proceeding. Jefferson's counsel found it necessary to interrupt and state for the record:

I think Commissioner Davis has set aside the cloak of being an impartial and fair hearing officer and taken on the role of an advocate and stating his opinion and cross-examining the witness [and] I object to that. I don't think we're getting a fair hearing and I would like that to be reflected in the record.

Procedural fairness requires a separation of the decision-making function from those of investigation and advocacy. *Hymanson & Lucky Lanes, Inc. v. City of St. Paul*, 329 N.W.2d 324, 329 (Minn.1983) (Scott, J., dissenting, joined by Todd, J., and Yetka, J.). Even the appearance of unfairness should be avoided in adjudicatory proceedings. *Minneapolis Police Department v. Minneapolis Commission on Civil Rights*, 425 N.W.2d 235, 242 (Minn.1988) (Popovich, J., concurring in part, dissenting in part, joined by Amdahl, C.J., and Yetka, J.).

We have encouraged administrative bodies, including the Minneapolis Commission on Civil Rights, to utilize administrative law judges to conduct hearings so as to avoid procedural unfairness or the perception of it. *Id.* at 242; *Swanson v. City of Bloomington*, 421 N.W.2d 307, 312 (Minn. 1988); *Kroll v. Independent School District No. 593*, 304 N.W.2d 338, 345 (Minn. 1981). The use of administrative law judges allows for the clear separation of the adjudicatory function from the advocative and prosecutorial roles commissions and boards often have.

Here, the record plainly supports a finding that the proceeding appeared unfair to counsel for relators. I therefore repeat my recommendation to the MCCR and other such bodies to use independent administra-

tive law judges for hearings, to make findings of fact, conclusions of law, and recommendations to the body that renders a final decision.

YETKA and KELLEY, JJ., join the special concurrence of POPOVICH, C.J.