STATE of Minnesota, by Stephen W. COOPER, Commissioner, Minnesota Department of Human Rights, Respondent,

v.

MOORHEAD STATE UNIVERSITY, Relator.

No. C3-89-1977.

Court of Appeals of Minnesota.

May 8, 1990.

**80**

Hubert H. Humphrey, III, Atty. Gen., Stephen Lemar Smith, Sp. Asst. Atty. Gen., St. Paul, for respondent.

James Patrick Barone, Sp. Asst. Atty. Gen., St. Paul, for relator.

Considered and decided by HUSPENI, P.J., and NORTON and SCHUMACHER, JJ.

## OPINION

NORTON, Judge.

Relator Moorhead State University seeks review of an order by the Department of Human Rights determining that Moorhead discriminated against a former probationary employee based on sex. We affirm.

## FACTS

In May 1987, the respondent Department of Human Rights issued a complaint charging relator Moorhead State University with sex discrimination. The Department's complaint was based upon allegations by Janice Hanstine, a former probationary groundskeeper, who had been terminated by Moorhead at the conclusion of her six-month probationary period.

The Department's complaint was referred to an administrative law judge, who conducted a three-day hearing. Several witnesses testified on behalf of both parties. It was Moorhead's position that Hanstine was terminated for poor job performance, and not because of her sex.

The testimony indicated that before Hanstine was hired, a Moorhead representative asked the Minnesota Department of Jobs and Training for assistance in hiring a groundskeeper. Moorhead indicated a preference for female applicants, since the school had never before hired a full-time female groundskeeper. The Department of Jobs and Training sent Moorhead three sets of applicants before Hanstine was hired. Hanstine had prior experience in road and grader work, loading trucks, and running some heavy equipment.

There was some evidence that a conflict existed between the groundskeeping department and personnel during the hiring process. Some witnesses testified that comments had been made about being forced to hire a minority. Other witnesses testified that the frustration was due to the delay in filling the position. The evidence indicated that the delay was due to administration's expressed preference for hiring a woman.

Hanstine testified that when she was hired, Gordon Bergman, Roads and Grounds Maintenance Coordinator, introduced her to other Moorhead employees. At one point, Bergman described a female janitor as a "troublemaker" and a "bitch," and stated that she was "after [his] body."

Karen Olson, a building maintenance worker, testified that on one occasion before Bergman became her boss, a more senior janitor stated that Olson's husband was a homosexual because he had a high pitched voice. According to Olson, Berg-

man laughed, and did nothing to stop the conversation.

Olson also testified that Bergman asked her more than once why she worked, since her husband had a good job. Olson stated that although Bergman had never directed any sexist comments towards her, he made her feel as though she should be at home, rather than working.

Moorhead's Master Plumber testified that there were no women at Moorhead doing mechanical, carpentry, electrical, plumbing, and engineering work "because you need a license." He also testified that several years ago a secretary had complained of harassment; however, the allegations only involved an incident when her car was scratched.

Bergman testified that he and some other workers, including women, had an inside joke about saying "koochy-koochy." Bergman believed Hanstine might not have appreciated the cat-calls, although they were never directed at her.

Bergman also testified that there were some nude pictures in the shop depicting females; however, he did not recall Hanstine complaining about the posters. Some of the posters were put up by a female secretary.

The evidence indicated that Hanstine was trained on-the-job, as were all other workers. The evidence also indicated that male and female student groundskeeping workers were treated the same way. Although Bergman's predecessor had divided tasks into female tasks and male tasks, and referred to the female workers as "flower girls," Bergman divided the tasks equally between the female and male students.

Three months after Hanstine was hired as a probationary employee, Bergman conducted an evaluation of her performance. The evaluation indicated that up to November 1986, Hanstine's performance was satisfactory.

Bergman testified that after Hanstine's three-month evaluation, her attitude and enthusiasm slipped and her performance went downhill. He stated that he discussed several problems with Hanstine and met with her to discuss specific complaints. At the end of her six-month probationary period, Bergman evaluated Hanstine as below standard, and recommended that she be terminated for poor job performance. Bergman testified that his recommendation was based upon Hanstine's inability to adjust to different ideas or learn different things, and her lack of initiative in learning to operate new equipment. Bergman did indicate that Hanstine's performance at the end of her six-month probationary period might have been adequate for a person with no experience, but in light of Hanstine's experience, her performance should have been better.

Bergman testified that shortly before he terminated Hanstine, he went to the chief union steward for "general information on terminating a female employee." Bergman explained that he was mainly interested in determining what to do about Hanstine's probationary status. He testified that at the time he decided to terminate Hanstine, it was not because of her sex, since he believed there would still be a disparity, and that female applicants would be referred to fill her position.

On February 6, 1987, approximately two weeks prior to her termination, Hanstine met with Bergman, who discussed three incidents with her and told her she was doing a good job. Hanstine testified that prior to her termination, she had no idea she was not performing adequately. Another employee, however, testified that Hanstine was aware she was performing adequately but could probably do some things better.

There was a large amount of evidence on the quality of Hanstine's job performance as a groundskeeper. Witnesses on behalf of the Department indicated that Hanstine's performance was satisfactory and that she had a good attitude. Witnesses presented by Moorhead testified that Hanstine's performance was not satisfactory and that she failed to obey general and specific work rules.

Moorhead's witnesses raised several specific problems with Hanstine's work, including her performance driving a garbage

packer, clearing or ridging snow, loading snow into a truck, and mowing. There was also evidence that Hanstine had damaged a Toro broom and had refused to go up in an aerial bucket to trim a tree limb. In addition, Bergman believed Hanstine had failed to adequately comply with her work because she should have reported for work earlier than her scheduled arrival time. The other groundskeepers, who were men, generally arrived early to drink coffee and talk.

After she was terminated, Hanstine decided to file a grievance against the university. Moorhead's affirmative action officer suspected that discrimination might have occurred; however, she reached no firm conclusion, since there were a number of specific incidents suggesting that Hanstine had problems performing her duties.

The parties stipulated to the method of calculating damages. Regarding the issue of damages, Hanstine testified that she had to spend money for counseling, since the termination had a "devastating" effect on her marriage, her self-esteem, and her efforts to obtain new employment. Hanstine's husband had relied on her position at Moorhead, and had quit his job to start his own business, which was unsuccessful because of their lack of funds. Hanstine and her husband eventually declared bankruptcy and required food stamps and other government assistance.

Following the hearing, the ALJ determined that Moorhead had discriminated against Hanstine because of her sex. The ALJ concluded that Hanstine was entitled to treble compensatory damages, damages for mental anguish, and punitive damages. The ALJ also awarded a civil penalty against Moorhead.

## ISSUES

1. Is the ALJ's decision supported by substantial evidence in view of the entire record?

2. Did the ALJ erroneously rely upon the Veterans Preference Act?

3. Did the ALJ improperly determine that Moorhead did not have "just cause" to terminate Hanstine?

4. Did the ALJ impose an excessive burden upon Moorhead when determining whether Moorhead had discriminated against Hanstine?

5. Did the ALJ err by awarding treble compensatory damages to Hanstine?

6. Was the ALJ's award of damages for mental anguish and suffering supported by the record?

7. Did the ALJ err by awarding punitive damages?

## ANALYSIS

### Standard of Review

Our review of the ALJ's decision is governed by Minn.Stat. § 14.69 (1988):

[T]he court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious.

Where the record contains conflicting evidence or where more than one inference may be drawn from that evidence, we will uphold the ALJ's factual findings. *City of Minneapolis v. Richardson*, 307 Minn. 80, 88, 239 N.W.2d 197, 202 (1976).

### I.

■ Minnesota has adopted the *McDonnell Douglas* analysis in resolving discrimination cases based upon claims of disparate treatment. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36

L.Ed.2d 668 (1973). This analysis has been described as follows:

> This procedure contemplates a three-part analysis for adjudicating disparate treatment claims. The analysis commences by initially placing upon any person claiming disparate treatment the onus of establishing a prima facie case of disparate treatment based upon a statutorily prohibited discriminatory factor. If a prima facie case is established, a presumption then arises that the defendant (usually, but not always, an employer) unlawfully discriminated against the claimant. The burden of producing evidence then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's treatment. If the defendant can produce sufficient evidence to raise a genuine issue of fact that its stated motive for treating the claimant as it did arose from legitimate nondiscriminatory reasons, the burden shifts to the claimant to demonstrate that the defendant's asserted legitimate reasons were pretextual.

*Anderson v. Hunter, Keith, Marshall & Co., Inc.,* 417 N.W.2d 619, 623–24 (Minn. 1988). A complainant has the ultimate burden of proving by a preponderance of the evidence that the alleged discrimination occurred. *Id.* at 627.

To establish a prima facie case, the complainant may show:

> (1) he [or she] is a member of a protected class;
>
> (2) he [or she] was qualified for the job from which he was discharged;
>
> (3) he [or she] was discharged; and
>
> (4) the employer assigned a nonmember of the protected class to do the same work.

*Hubbard v. United Press International, Inc.,* 330 N.W.2d 428, 442 (Minn.1983).

Hanstine is a member of a protected class, because she is a woman. *See* Minn. Stat. § 363.03, subd. 1(1) (1986). Hanstine's testimony and the testimony by her witnesses suggested that she was qualified for the position of groundskeeper, at least on paper. When Hanstine was discharged from her position as groundskeeper, a male was hired in her place.

The ALJ found that Moorhead had raised a genuine issue of fact regarding the reason for Hanstine's discharge. The ALJ noted that Moorhead's assertion of poor work performance was raised to challenge Hanstine's prima facie case, as well as to produce a legitimate, nondiscriminatory reason for the discharge.

The ALJ found that Moorhead did not really discharge Hanstine for her poor work performance, but discharged her because of her sex. The ALJ based her decision in part upon a finding that "there [was] no credible evidence to support a conclusion that Ms. Hanstine's work performance was poor."

The ALJ found that the testimony of several Moorhead witnesses was

> fraught with inconsistency, incredulous statements and innuendo. Their recollection was often not their own and several witnesses were impeached by their prior deposition testimony and statements
> * * *.

We agree that some testimony differed from prior deposition testimony; however, we note that the hearing in this matter did not take place until two years after Hanstine filed her complaint. In fact, Hanstine's own testimony was not always entirely consistent. For example, she stated that it took six hours to fix the Toro broom, although it was repaired by noon and she started work at seven o'clock.

We will generally defer to the factfinder's determination regarding credibility, and will not substitute our own judgment. *Sigurdson v. Isanti County,* 386 N.W.2d 715, 721 (Minn.1986). However, the record contains a substantial amount of testimony regarding Hanstine's job performance, much of it criticizing her work. To sustain the ALJ's finding that Hanstine was not terminated for poor job performance requires considerable deference to the ALJ's credibility determination.

The ALJ made eleven specific findings to support her determination that discrimination occurred. While we are troubled by the shortcomings pointed out by the dis-

sent, we nevertheless are bound by our limited scope of review to affirm the ALJ's determination, since that determination was founded almost entirely on the ALJ's determination of credibility.

## II.

Moorhead argues the ALJ improperly relied upon the Veterans Preference Act to support her finding of discrimination and award of damages. *See* Minn.Stat. § 197.455 (1986).

The ALJ discussed the Veterans Preference Act in arriving at her determination of damages. However, this discussion appears limited to an explanation that the Veterans Preference Act was not applicable to these proceedings. The ALJ did not mention the Veterans Preference Act when determining whether discrimination had occurred.

## III.

■ Moorhead argues the ALJ improperly relied upon a "just cause" standard in finding discrimination. Moorhead argues that the union contract covering Hanstine's position did not require just cause to terminate a probationary employee.

The ALJ mentioned "just cause" only in summarizing testimony by Moorhead's Director of Personnel. There is no indication that the ALJ herself employed a just cause standard.

## IV.

■ Moorhead claims the ALJ held Moorhead to an improper burden of proof by stating that Moorhead should conduct its business in a manner which is "above reproach."

The ALJ did indicate that because Moorhead is a state institution, it should conduct its business in a manner above reproach. However, the ALJ did not hold Moorhead to this higher standard when determining whether discrimination had occurred, but looked at this standard when computing punitive damages. One of the factors in determining punitive damages is the "seriousness of hazard to the public arising from the defendant's misconduct * * *." Minn.Stat. § 549.20, subd. 3 (1986).

## V.

■ Minn.Stat. § 363.071, subd. 2 (1986) provides that upon a finding of discrimination, an ALJ "shall order the respondent to pay an aggrieved party, who has suffered discrimination, compensatory damages in an amount up to three times the actual damages sustained." Here, the ALJ awarded treble compensatory damages, reasoning:

In determining that this award was appropriate, particularly with respect to treble damages, the administrative law judge considered the same factors as the law requires with respect to punitive damages.

Moorhead challenges this standard, claiming the ALJ had already awarded punitive damages and should not have relied on the same standard in awarding treble compensatory damages.

We considered a similar argument in *State ex rel. Cooper v. Mower County Social Services*, 434 N.W.2d 494 (Minn.Ct. App.1989). There, the ALJ had awarded damages for mental anguish and suffering and this court affirmed, noting that the complainant had been awarded punitive damages, which evidenced a willful indifference to her rights. We therefore concluded that the county's conduct was sufficiently severe to justify damages for mental anguish and suffering. *Id.* at 500. Similarly, in the present case, the ALJ awarded punitive damages based on a determination that Moorhead's actions demonstrated a willful indifference to Hanstine's rights.

As the respondent Department notes, even if the administrative law judge improperly used the punitive damage standard for awarding treble compensatory damages, such standard is actually higher than necessary, and was therefore not prejudicial.

## VI.

■ Moorhead argues the ALJ's award of damages for mental anguish and suffer-

ing is not supported by the record, but is based only on Hanstine's self-serving testimony. As the ALJ found, however, Hanstine testified that she was "devastated" by the loss of her job and the resultant deterioration of her family and financial situations. It is the function of the ALJ to evaluate the credibility of Hanstine's testimony, and since the ALJ's finding is supported by such testimony, we will not substitute our own judgment. *Sigurdson*, 386 N.W.2d at 721.

## VII.

■ Moorhead finally argues the ALJ's award of punitive damages is not supported by the record. Minn.Stat. § 363.071, subd. 2 authorizes punitive damages pursuant to Minn.Stat. § 549.20 which states:

Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show a willful indifference to the rights or safety of others.

Minn.Stat. § 549.20, subd. 1 (1986). Factors to consider include:

the seriousness of hazard to the public arising from the defendant's misconduct, the profitability of the misconduct to the defendant, the duration of the misconduct and any concealment of it, the degree of the defendant's awareness of the hazard and of its excessiveness, the attitude and conduct of the defendant upon discovery of the misconduct, the number and level of employees involved in causing or concealing the misconduct, the financial condition of the defendant, and the total effect of other punishment likely to be imposed upon the defendant as a result of the misconduct, including compensatory and punitive damage awards to the plaintiff and other similarly situated persons * * *.

Minn.Stat. § 549.20, subd. 3.

The ALJ found that punitive damages were appropriate because Moorhead is a state institution "which should conduct its business in a manner which is above reproach." The ALJ pointed to the fact that the attitude and conduct of students are shaped by the attitudes and conduct of Moorhead's personnel. The ALJ found that Moorhead had encouraged the students to fabricate testimony, as well as cover up the discrimination. These findings are sufficient to support the award of punitive damages.

## DECISION

The ALJ relied upon the proper factors in determining that discrimination occurred and in awarding damages, and her decision is supported by the record.

Affirmed.

SCHUMACHER, J., dissents with opinion.

SCHUMACHER, Judge (dissenting):

I respectfully dissent. Moorhead originally opened the groundskeeping position to bids from inside the University, but no current Moorhead employees applied for the position. Moorhead's personnel department was informed by the Minnesota Department of Employee Relations that the position should be filled by a woman, so the personnel department requested the Minnesota Department of Jobs and Training for assistance in filling the position with a woman.

Moorhead presented testimony from thirteen witnesses; the ALJ found none of them credible. The record as a whole persuades me that the ALJ may have been predisposed to find discrimination. In numerous instances, she questioned Moorhead's witnesses, demanding further explanations of their testimony and/or actions. In *Shockency v. Jefferson Lines*, 439 N.W.2d 715 (Minn.1989), the court stated:

The line between what questioning is reasonably necessary to get clear answers from unresponsive witnesses and what is beyond what is reasonably necessary is, at times, a fine one.

*Id.* at 718. The ALJ appears to have stepped over that line in this case.

It is clear to me that the overwhelming weight of the evidence shows that Hanstine was merely miscast for this particular job

and simply could not perform the duties required of her. I would reverse.