**ROCHESTER CITY LINES CO., Relator,**

v.

**CITY OF ROCHESTER, et al., Respondents,**

**First Transit, Inc., Respondent.**

**A16-1515**

Court of Appeals of Minnesota.

Filed May 15, 2017

Gary A. Van Cleve, Rob A. Stefonowicz, Bryan J. Huntington, Larkin Hoffman Daly & Lindgren Ltd., Minneapolis, Minnesota; and Steven A. Diaz (pro hac vice), Law Office of Steven A. Diaz, Washington, D.C. (for relator).

John M. Baker, Monte A. Mills, Katherine M. Swenson, Greene Espel PLLP,

Minneapolis, Minnesota (for respondents City of Rochester and Justin L. Templin).

Charles K. Maier, Richard C. Landon, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, Minnesota (for respondent First Transit).

Considered and decided by Kirk, Presiding Judge; Schellhas, Judge; and Bratvold, Judge.

## OPINION

SCHELLHAS, Judge

On this certiorari appeal, relator challenges the denial of its protest to a request for proposals for the operation of municipal public transit services. Because the request for proposals includes a provision that creates an impermissible appearance of bias, we reverse.

## FACTS

For decades, relator Rochester City Lines Co. (RCL) operated fixed-route public transit services in respondent City of Rochester under a series of noncompetitive contracts with the city. In 2011, the Federal Transit Administration (FTA) informed the city that, to continue to receive federal funding for public transit, the city must use a competitive bidding process to award future contracts for the operation of its public transit services.

The city accordingly issued a request for proposals (RFP) to operate its fixed-route public transit services for the period from July 1, 2012, to December 31, 2016 (2012 RFP). RCL and respondent First Transit Inc. (First Transit) were among the four companies that submitted proposals in response to the 2012 RFP. In February 2012, while the city was still receiving proposals, RCL sued the city in

connection with the 2012 RFP (2012 RFP litigation). In April 2012, pending the 2012 RFP litigation, the city awarded the 2012 contract to First Transit. In June 2012, RCL amended its complaint in the 2012 RFP litigation, adding First Transit as a named defendant and adding a *Griswold* claim against the city.[1] In July 2012, First Transit began operating fixed-route public transit services in the city under the 2012 contract.

In June 2013, the district court entered summary judgment against RCL on each of its claims in the 2012 RFP litigation. This court affirmed. *Rochester City Lines, Co. v. City of Rochester*, 846 N.W.2d 444, 449 (Minn. App. 2014), *review granted* (Minn. June 17, 2014). On August 19, 2015, the supreme court affirmed in part, reversed in part, and remanded for further proceedings on RCL's *Griswold* claim. *Rochester City Lines, Co. v. City of Rochester*, 868 N.W.2d 655, 665 (Minn. 2015) (*RCL I*), *cert. denied*, —— U.S. ——, 136 S.Ct. 849, 193 L.Ed.2d 720 (2016). RCL's *Griswold* claim is scheduled for court trial on May 22, 2017.

On June 21, 2016, as the 2012 contract neared its end, the city issued an RFP to operate its fixed-route and paratransit public transit services for the period from January 1, 2017, to December 31, 2021 (2016 RFP). The 2016 RFP provides a process by which a potential bidder may raise "protests of or relating to" the 2016 RFP prior to submitting a proposal (prebid protest). The 2016 RFP also names respondent Justin L. Templin, whom the city appointed as Special Assistant City Attorney, as the "Moderator of the RFP process" (the moderator) and establishes that the moderator is authorized to make "the final decision ... at the City level" on

1. A *Griswold* claim alleges "unreasonable, arbitrary, or capricious" government action in

the letting of public contracts. *Griswold*, 242 Minn. at 535, 65 N.W.2d at 652.

any pre-bid protest. An August 18, 2016 addendum to the 2016 RFP [2] names each of the city's four public-transit administrators as members of the committee tasked with evaluating proposals received in response to the 2016 RFP (2016 evaluation committee). Five of the eight members of the 2016 evaluation committee previously served as members of the committee that evaluated proposals received in response to the 2012 RFP (2012 evaluation committee).

■ On August 22, 2016, RCL brought to the moderator a pre-bid protest, challenging several provisions of the 2016 RFP and requesting relief in the form of revisions to the RFP and debarment of First Transit.[3] The moderator denied RCL's protest on August 26. The 2016 evaluation committee then began its evaluation of the four proposals received in response to the 2016 RFP, including bids by RCL and First Transit. On September 22, RCL petitioned this court for a writ of certiorari, naming the city and the moderator in his official capacity as respondents (city respondents) and seeking review of the moderator's denial of its pre-bid protest. First Transit later intervened in this certiorari appeal as an additional respondent, indicating to this court that the city awarded the 2016 contract to First Transit on November 7.

## ISSUE

Did the moderator commit reversible error by denying RCL's pre-bid protest to the 2016 RFP?

## ANALYSIS

The 2016 RFP promises a best-value competitive bidding process consistent with relevant FTA guidelines. "Best-value bidding, as described by the FTA, is a procedure by which the award of a government contract depends on which proposal represents the best value based on an analysis of the tradeoff of qualitative technical factors and price or cost factors." *RCL I*, 868 N.W.2d at 658 (quotation omitted).

■ Like any competitive bidding process, best-value bidding must "provide a fair process and incorporate sufficient controls to safeguard against abuses." *Id.* at 660 (citing *Griswold*, 242 Minn. at 536, 65 N.W.2d at 652). In other words, best-value bidding may not be pursued " 'in an unreasonable, arbitrary, or capricious manner,' " *id.* at 659 (quoting *Griswold*, 242 Minn. at 535, 65 N.W.2d at 652), that represents "an exercise of the [municipality]'s 'will' rather than its 'judgment,' " *id.* at 660 (quoting *Markwardt v. State, Water Res. Bd.*, 254 N.W.2d 371, 374 (Minn. 1977)). A municipality's adoption or use of "any procedure that 'emasculates the safeguards of competitive bidding' invalidates the process and [any] contract" awarded through that process. *Id.* (quoting *Griswold*, 242 Minn. at 536, 65 N.W.2d at 652).

In regard to RCL's pre-bid protest, the moderator therefore was faced with the question whether any challenged provision of the 2016 RFP renders the 2016 RFP process unreasonable, arbitrary, or capricious by undermining the procedural fairness required of a best-value competitive bidding process. The moderator answered

---

**2.** All subsequent references to "the 2016 RFP" are inclusive of both the 2016 RFP document itself and the August 18 addendum to the 2016 RFP.

**3.** "Debarment is a discretionary government sanction that excludes a contractor from contracting with the government for a reasonable, specified period. . . ." *OSG Prod. Tankers LLC v. United States*, 82 Fed.Cl. 570, 577 (2008) (quotation omitted).

that question in the negative and rejected each of RCL's protest claims. As acknowledged by RCL in its certiorari petition, the moderator's denial of RCL's pre-bid protest to the 2016 RFP was a quasi-judicial decision. *See id.* at 657–58, 662–63 (concluding that city's denial of RCL's pre-bid protest to 2012 RFP was quasi-judicial decision); *see also Minn. Ctr. for Envtl. Advocacy v. Metro. Council,* 587 N.W.2d 838, 842 (Minn. 1999) (identifying as "indicia of quasi-judicial actions ... (1) investigation into a disputed claim and weighing of evidentiary facts; (2) application of those facts to a prescribed standard; and (3) a binding decision regarding the disputed claim").

■ "We review a quasi-judicial decision rendered by a city under a limited and nonintrusive standard of review." *Sawh v. City of Lino Lakes,* 823 N.W.2d 627, 635 (Minn. 2012) (quotation omitted); *see also Gustafson v. Comm'r of Human Servs.,* 884 N.W.2d 674, 686 (Minn. App. 2016) (stating that certiorari review of quasi-judicial decision "seeks to 'minimize the judicial intrusion into administrative decision-making' and to 'avoid usurpation of the executive body's administrative prerogatives' " (quoting *Tischer v. Housing & Redevelopment Auth.,* 693 N.W.2d 426, 429 (Minn. 2005))). "Under that standard, we may not substitute our own findings of fact for those of a city, or engage in a de novo review of conflicting evidence." *Sawh,* 823 N.W.2d at 635; *see also Staeheli v. City of St. Paul,* 732 N.W.2d 298, 303 (Minn. App. 2007) (stating that "reviewing court ... will not retry facts or make credibility determinations"). "Instead, we must uphold a city's decision if the city has explained how it derived its conclusion and the city's conclusion is reasonable on the basis of the record." *Sawh,* 823 N.W.2d at 635 (quotation omitted).

We consider first RCL's challenge to the moderator's rejection of its protest claim that the 2016 evaluation committee is not fair and impartial because five of the eight members of the 2016 evaluation committee were also members of the 2012 evaluation committee. According to RCL, each member of the 2012 evaluation committee was "tainted by participation in an evaluation process that the evidence shows relied upon a collusive agreement between the City and First Transit to rig the proposal evaluation process, with respect to interviews and scoring." Citing *Griswold,* RCL argues that the city's inclusion of five of these "tainted" individuals (holdover members) on the 2016 evaluation committee undermined the fairness and impartiality of that committee and renders the 2016 RFP process "inherently unfair."

■ To the extent that RCL asks us to conclude that the 2012 RFP process was infected by the city's bias against RCL and/or favoritism towards First Transit, we expressly decline to do so. *See Sawh,* 823 N.W.2d at 635 (stating that "we may not substitute our own findings of fact for those of a city, or engage in a de novo review of conflicting evidence"). We reject RCL's assertions in briefing and at argument before this court that the issue of bias or favoritism in the 2012 RFP process is "undisputed" in the ongoing 2012 RFP litigation. The supreme court did not resolve that issue in *RCL I;* it merely concluded that "the evidence in the record does not exclude the possibility that bias against RCL, or favoritism toward First Transit, improperly influenced the City's bidding process," and it remanded RCL's *Griswold* claim for trial. 868 N.W.2d at 665. The moderator therefore properly declined to make a finding as to whether the 2012 RFP process involved bias or favoritism, because that question has yet to be

answered by a trier of fact in the 2012 RFP litigation.

As noted by city respondents, RCL presented the moderator with no evidence that any member of the 2016 evaluation committee acted with actual bias in the 2016 RFP process. Indeed, RCL likely could not have produced such evidence at the time of its pre-bid protest, which it brought to the moderator just four days after the composition of the 2016 evaluation committee was finalized and before the committee began evaluating the four proposals received in response to the 2016 RFP. City respondents argue that, absent evidence of actual bias in the 2016 RFP process or a judicial finding that the 2012 RFP process involved bias or favoritism, RCL cannot show that the city's inclusion of the five holdover members on the 2016 evaluation committee renders the 2016 RFP process unreasonable, arbitrary, or capricious. We disagree.

■ In *Griswold*, the supreme court stated:

A fundamental purpose of competitive bidding is to deprive or limit the discretion of contract-making officials in the areas which are susceptible to such abuses as fraud, favoritism, improvidence, and extravagance. Any competitive bidding procedure which defeats this fundamental purpose, even though it be set forth in the initial proposal to all bidders, invalidates the [resulting] contract although subsequent events establish .... that no actual fraud was present.

242 Minn. at 536, 65 N.W.2d at 652. In other words, a competitive bidding process is unreasonable, arbitrary, or capricious if any part of that process invites fraud or favoritism, even if fraud or favoritism does not, in fact, result. *See id.* at 535–36, 65 N.W.2d at 652 ("Generally it is presumed that public officials have entered into public contracts in good faith and actual fraud in a particular instance must be proved, but this rule has no application in a determination of whether the requirements of competitive bidding have been met in the letting of a contract and, as a matter of sound public policy, such a contract is void, without any showing of actual fraud or an intent to commit fraud, if a procedure has been followed which emasculates the safeguards of competitive bidding." (footnotes omitted)); *cf. Rochon Corp. v. City of St. Paul*, 814 N.W.2d 365, 369 (Minn. App. 2012) (noting importance of "reproach-free bidding," stating that "[t]he concern is the *possibility* of creating the opportunity for fraud or collusion, not only *actual* fraud or collusion," and disapproving aspects of city's competitive bidding process that "call[ed] the fairness of the process into substantial doubt" and gave rise to "the appearance of both folly and favoritism"), *review denied* (Minn. July 17, 2012).

Minnesota caselaw has long recognized that procedural fairness may require vigilance against apparent bias—not just actual bias. *See, e.g., In re Collection of Delinquent Real Prop. Taxes*, 530 N.W.2d 200, 206 (Minn. 1995) (stating that "no judge, when other judges are available, ought ever to try the cause of any citizen, *even though he be entirely free from bias in fact*, if circumstances have arisen which give a bona fide appearance of bias to litigants"); *L & H Airco, Inc. v. Rapistan Corp.*, 446 N.W.2d 372, 377 (Minn. 1989) ("An impression of bias contaminates the decision making process when neutrality is essential and is not condoned by this court."); *Shockency v. Jefferson Lines*, 439 N.W.2d 715, 720 (Minn. 1989) (Popovich, C.J., concurring specially) ("We have encouraged administrative bodies ... to utilize administrative law judges to conduct hearings so as to avoid procedural unfairness or the perception of it." (collecting

cases)); *Petition of N. States Power Co.,* 414 N.W.2d 383, 384, 386–87 (Minn. 1987) (stating that utility commissioner's "mere presence" at rate-increase proceedings "creates the obvious appearance of impropriety and undermines the public confidence in the system" where commissioner was in ongoing negotiations with utility for future employment, and affirming conclusion below that proceedings were "tainted" by commissioner's "real or perceived" conflict of interest notwithstanding absence of evidence that commissioner "unduly influenced" rate-increase decision); *Pirsig v. Pleasant Mound Mut. Fire Ins. Co.,* 512 N.W.2d 342, 344 (Minn. App. 1994) ("It is not enough that the arbitrators be unbiased; they must not even appear to be biased."); *1989 St. Imp. Program (117th St.) v. Denmark Twp., Washington Cty., Minn.,* 483 N.W.2d 508, 510 (Minn. App. 1992) ("Citizens may mistrust, or become cynical of, the government where there is a strong appearance of impropriety.... Where there is a choice, city officials should avoid actions which may appear tainted of impropriety, even though they are legal.").

■ Indeed, a Minnesota judge, for example, must "disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." Minn. Code Jud. Conduct Rule 2.11(A). Judicial " 'impartiality' ... mean[s] absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind in considering issues that may come before a judge." Minn. Code Jud. Conduct, Terminology. "A judge is disqualified due to an appearance of partiality if a reasonable examiner, with full knowledge of the facts and circumstances, would question the judge's impartiality." *State v. Finch,* 865 N.W.2d 696, 703 (Minn. 2015) (quotation omitted). Moreover, a dis-

qualified judge's participation in a group decision-making process may import an appearance of partiality into the process and undermine the validity of the decision itself, even if the decision did not turn on the disqualified judge's participation. *See Powell v. Anderson,* 660 N.W.2d 107, 123 (Minn. 2003) (concluding that disqualified appellate judge's participation in panel decision, which participation included his authorship of unanimous opinion explaining panel's decision, "was not cured by the fact that two qualified judges joined his opinion").

We recognize that judicial disqualification standards do not apply to municipal actors in a competitive bidding process, but we see in recent disqualification cases the expression of a more general principle that procedural fairness may depend in great measure on the apparent neutrality of the decision-maker(s). *See, e.g., Finch,* 865 N.W.2d at 705 (holding that district court judge was disqualified in probation revocation proceeding where "a reasonable examiner would question whether the judge could impartially conduct the proceeding" because judge "unequivocally told [the probationer] that the court would revoke his probation for any violation" and "speculated that [the probationer] had 'duped' the court when he exercised his right to appeal"); *State v. Cleary,* 882 N.W.2d 899, 908 (Minn. App. 2016) (holding that district court judge's failure to disqualify himself or herself in probation revocation proceeding based on probationer's termination from drug court "creates an appearance of partiality, and implicates a violation of [the] probationer's due-process rights" where the judge participated in the decision to terminate probationer from drug court). Given *RCL I*'s emphasis on procedural fairness in competitive bidding, 868 N.W.2d at 660, we apply the principle of procedural fairness to require apparent neutrality from bid evaluators.

Although we have found little Minnesota law directly on point, we note that federal law shows sensitivity to apparent bias in the context of competitive bidding and procurement. *See, e.g., NKF Eng'g v. United States*, 805 F.2d 372, 377–78 (Fed. Cir. 1986) (holding that federal agency was authorized to disqualify bidder based on "an appearance of impropriety" to ensure "the integrity of the bidding process"); *Jacobs Tech. Inc. v. United States*, 100 Fed.Cl. 198, 217 (2011) ("A contracting officer is obligated to protect the integrity of the procurement system and to avoid even the appearance of an impropriety."); *Turner Constr. Co. v. United States*, 94 Fed.Cl. 561, 576 (2010) (stating that presumption of prejudice arising from organizational conflict of interest "coincides with the emphasis on avoiding even the appearance of impropriety in federal procurements"), *aff'd*, 645 F.3d 1377 (Fed. Cir. 2011); *Joseph L. DeClerk & Assocs., Inc. v. United States*, 26 Cl.Ct. 35, 42 (1992) (stating that "appearances of impropriety are to be strictly frowned upon during the bid solicitation"). As the Court of Federal Claims recently put it, "[t]he bedrock of th[e] legal criteria" for federal procurement is that

> procurements are to be conducted fairly and transparently. The government would find its operations considerably more difficult if vendors could not routinely assume they were being treated in a straight forward fashion. Disappointed offerors inevitably complain about what amount to good faith disagreements with agency evaluators. They should not have to worry that government employees do not take their duties seriously.

*Starry Assocs., Inc. v. United States*, 131 Fed.Cl. 208, 210–11, 212–14 No. 16-44C, 2017 WL 1315756, at *2, *4–5 (Mar. 31, 2017) (awarding attorney fees and costs to losing bidder on bid-protest action whose "record contains a lengthy history of agency personnel being indifferent to the fideli-

ty of the procurement process," including evidence that "[o]ne of the [technical evaluation panel] members ... remained on the panel even though her impartiality was questioned, having been involved in the past performance rating of an unrelated ... contract" with winning bidder (quotation omitted)).

Based on this persuasive authority, we hold that a best-value competitive bidding process and any contract awarded through that process are rendered unreasonable, arbitrary, or capricious by an RFP provision that creates an appearance of bias. In other words, a *Griswold* claim may be based on an allegation that an RFP provision creates an impermissible appearance of bias. *See RCL I*, 868 N.W.2d at 665 (concluding that *Griswold* claim survives because "evidence in the record does not exclude the possibility that bias ... or favoritism ... improperly influenced the City's bidding process"). If the RFP provides for pre-bid protests, such a claim is forfeited if not raised in a pre-bid protest. *Cf. RCL I*, 868 N.W.2d at 661–62 (concluding that RCL forfeited claim relating to allegedly " 'unreasonable' " provisions of 2012 RFP "by failing to raise [that claim] in accordance with the pre-bid protest procedures outlined in the RFP"). If the claim is not forfeited or otherwise procedurally barred, it may be raised in district court. *Cf. Griswold*, 242 Minn. at 532–33, 535–38, 65 N.W.2d at 650, 652–53 (affirming district court judgment permanently enjoining county from proceeding with construction project awarded by contract that was rendered invalid by unreasonable, arbitrary, or capricious provision in request for bids).

In this case, the 2016 RFP provides for pre-bid protests, and we read RCL's pre-bid protest to the composition of the 2016 evaluation committee to include

an allegation of apparent bias arising from the city's inclusion of the five holdover members on the 2016 evaluation committee. The moderator denied RCL's pre-bid protest as follows:

[I]t is critical to note that the Minnesota Supreme Court did not decide that anything about the [2012 RFP process] was improper. Rather, [*RCL I*] states only that summary judgment was improperly granted because ... the record did not conclusively "exclude the possibility" that bias or favoritism may have been at work during the selection process. Such an order is a far cry from a finding that any member of the committee was actually biased and that any such bias impacted the outcome of the RFP process, or that any individuals acted to skew the outcome of that process in any particular way. Allegations are not facts.

Regardless, the RFP process that will be followed in this matter makes any possible repeat of such "procedural irregularities" impossible.... [T]he City concluded that its staff members who are in day-to-day contact with the operator of its transit and paratransit service are best suited to evaluate proposals responsive to the RFP. Those individuals are part of the Evaluation Committee, and the City's decision to include them is rational and reasonable.

The moderator thereby failed to consider (1) whether an appearance of bias results from the city's inclusion of the five holdover members on the eight-member 2016 evaluation committee; and, if so, (2) whether that appearance of bias renders the 2016 RFP process unreasonable, arbitrary, or capricious under *Griswold*.

Those omissions are jarring in light of the nature and conduct of the 2012 RFP litigation, a years-long public dispute with which the moderator was obviously familiar and during which RCL repeatedly has accused the 2012 evaluation committee of variously described wrongdoing. In fact, RCL's June 6, 2012 amended complaint singles out three of the five holdover members by name, alleging that they "exhibited animosity and hostility toward [RCL]." Public records show that each of the five holdover members was deposed at least once in connection with the 2012 RFP litigation before being named to the 2016 evaluation committee. The 2012 RFP litigation has been to the supreme court and back and is yet unresolved as of the date of this opinion.

Moreover, RCL's pre-bid protest to the 2016 RFP echoes its earlier accusations against the holdover members, naming each of those members as a participant in "score rigging" during the 2012 RFP process and labeling each of those members as a "taint" on the work of the 2016 evaluation committee. And the evidence produced by RCL in support of its protest includes business e-mail messages to and from one of the holdover members, characterized in the protest as evidence of the 2012 evaluation committee's "misbehavior."

Although we are mindful that we must apply a limited and nonintrusive standard of review here, on these facts we cannot accept as reasonable the moderator's conclusion that the city's inclusion of the holdover members on the 2016 evaluation committee is "rational and reasonable." Instead, we conclude that an impermissible appearance of bias results from inclusion of the five holdover members on the 2016 evaluation committee, invalidating both the 2016 RFP process and any contract awarded through that process. We therefore reverse the moderator's denial of RCL's pre-bid protest on that ground. We decline to consider and do not decide whether the moderator committed reversible error by denying any of RCL's other pre-bid protest claims.

## DECISION

Because an appearance of bias results from the city's inclusion of the holdover members on the 2016 evaluation committee, the moderator unreasonably concluded that inclusion of the holdover members is permissible under *Griswold.* We reverse the moderator's denial of RCL's pre-bid protest and hold that the 2016 RFP process and any contract awarded through that process are invalid.

**Reversed.**