# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2375

_____

| | | |
|---|---|---|
| Twylla Mae Turney, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| Russell Waterbury, individually and | * | |
| in his official capacity as Bennett | * | |
| County Sheriff; Bruce McMillin, | * | |
| individually and in his official capacity | * | |
| as Bennett County Deputy Sheriff; | * | |
| Tracy Merchen, individually and in her | * | |
| capacity as an employee of Bennett | * | |
| County; Bennett County Sheriff's | * | |
| Department; Bennett County, | * | |
| South Dakota, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: May 13, 2004
Filed: July 19, 2004

_____

Before MURPHY, HEANEY, and MAGILL, Circuit Judges.

_____

HEANEY, Circuit Judge.

Twylla Mae Turney brought this civil rights suit against the Bennett County Sheriff's Department, Bennett County, the State of South Dakota, Bennett County

Sheriff Russell Waterbury, Chief Deputy Bruce McMillin, and jailer Tracy Merchen (collectively the Defendants) to recover damages related to the in-custody suicide of her son, Bill Keith Turney. The Defendants moved for summary judgment on the basis of qualified immunity. The district court granted the motion, and Turney appealed. We reverse the grant of summary judgment as to Waterbury, and affirm in all other respects.

## BACKGROUND

In October of 2001, Bill Turney was arrested on an outstanding warrant. When he was brought in to the Bennett County jail, he became violent and threatening. Due to Turney's behavior, Sheriff Waterbury decided to transfer Turney to the Pennington County jail.

On October 20, 2001, while Turney was held at the Pennington County jail, he informed one of the officers at the jail that "he was going to hang it up." (Appellant's App. at 75.) Shortly thereafter, officers rushed to Turney's cell at the behest of another inmate to find Turney with a bed sheet tied around his neck. Turney tried to fight off the officers when they tried to help him, so they sprayed Turney with pepper spray. The officers were then able to cut the sheet away from Turney's neck, and placed Turney on a suicide watch for the remainder of his stay at Pennington County jail.

Turney was transferred back to the Bennett County jail on October 23, 2001 in order to attend an October 24th hearing for his pending criminal proceedings. Turney's lawyer had apparently reached a plea agreement in which Turney would serve 15 years for his criminal offenses. Turney did not want to return to prison; according to various sources, it was widely known that Turney had provided information regarding a prison killing, and there was a legitimate chance of retaliation if he were to go back. Bennett County Deputy Sheriff Shannon Butler picked up

Turney for the trip back to the Bennett County jail. He was informed by Pennington County jail staff that Turney had tried to hang himself on October 20th and that it took several people to restrain him. Butler, escorted by a South Dakota Highway Patrol officer, drove Turney back to Bennett County without incident. When they arrived in town, Sheriff Waterbury assisted in bringing Turney into the Bennett County jail. Butler told Waterbury that Turney had tried to kill himself in the Pennington County jail and had violently resisted attempts to stop him. Butler also told Waterbury that on the drive Turney had said something to the effect that if he received more than a 15 year sentence he would die and take someone with him. Waterbury made no attempt to follow up with Pennington County to get additional details about Turney's suicide attempt.

When Waterbury brought Turney into the Bennett County jail, Tracy Merchen was on duty as the only jailer and dispatcher. Typically, jailers have incoming inmates complete an intake form when they arrive; one of the questions on the form inquires as to whether the inmate has ever tried suicide, and if so, where. Turney did not complete the intake form because Waterbury brought Turney directly to a cell. Turney was held in a cell by himself in an area that could be double locked, rather than with the general population of the jail. Waterbury contends he put Turney in a cell alone because he was afraid Turney may hold someone hostage. Waterbury stayed at the jail for some time, and left after helping to serve dinner to the inmates.

Before leaving, Waterbury told Merchen that she should keep an eye on Turney, and perform ten-minute checks on him. Waterbury never told Merchen that Turney had tried to kill himself just three days earlier at the Pennington County jail. In her deposition, Merchen said she did not know that Turney was a suicide risk, but assumed from Waterbury's instructions that he was on a suicide watch. Waterbury advised Merchen that under no circumstances was she to enter Turney's cell without the company of a deputy.

Bruce McMillin was the Chief Deputy Sheriff of Bennett County, and was the only deputy on duty in Bennett County on the night of October 23rd. Waterbury claims that he specifically told McMillin to pay close attention to Turney that night, but McMillin testified that he was never so instructed. According to McMillin, he did not know that Turney had tried to kill himself in Pennington County, that Waterbury had placed Turney on a ten-minute watch, or that Waterbury had ordered Merchen not to enter Turney's cell unaccompanied. McMillin checked in at the jail around 4:00 p.m., asked Merchen if there were any problems, stayed for a short while, and then left.

At about 6:30 p.m., Turney asked Merchen if he could make a phone call. She went back to his cell and told Turney that she had to call McMillin back to the jail before he could make his call. In her deposition, Merchen recalled that she did not see a bed sheet at this time, but did not think it unusual because inmates often leave their bedding out of view, folded up toward the top of their bunks. Merchen then called McMillin, who responded that he was on his way back from his residence and would come to the jail. Within a few minutes, Merchen went to tell Turney that she had asked McMillin to come in, and found Turney hanging with a bed sheet tied around his neck, suspended from the bars which made up the cell's ceiling.

Under orders not to enter Turney's cell for any reason, Merchen did not try to open Turney's cell and cut him loose. Instead, she went back to her dispatch post and radioed McMillin again. She told him to come in right away because Turney was hanging himself. Merchen then called Waterbury at his home, which was a short distance from the jail. Waterbury was lying down at the time, so his wife answered the phone and took a message for him to call the office immediately. When he did call, Merchen told him to come in right away because Turney was trying to hang himself. Waterbury went quickly to the jail and saw Turney in his cell hanging. Armed with a cutting tool, he entered the cell to get Turney down. He could not reach Turney from the floor so he crawled on to the top bunk and cut the bed sheet

from Turney's neck. Turney dropped to the floor, and Waterbury removed the rest of the bed sheet from Turney's neck. An ambulance arrived, and Turney was rushed to the Bennett County Hospital emergency room. Attempts to revive Turney were unsuccessful, and he was pronounced dead at 7:55 p.m.

Twylla Turney, Bill Turney's mother, brought suit on behalf of Bill's estate under 42 U.S.C. § 1983 against Sheriff Waterbury, Chief Deputy McMillin, Tracy Merchen, the Bennett County Sheriff's Department, Bennett County, and South Dakota. The Defendants moved for summary judgment on the basis of qualified immunity. The district court granted summary judgment in favor of Waterbury, McMillin, and Merchen because it found they were not deliberately indifferent to Turney's suicide risk. It granted summary judgment in favor of the sheriff's department, county, and state because Turney had failed to show that Bennett County had notice that its training was inadequate and may result in the deprivation of a person's constitutional rights. This appeal followed.

## ANALYSIS

We review the district court's grant of summary judgment de novo. Yellow Horse v. Pennington County, 225 F.3d 923, 926 (8th Cir. 2000). "Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." Id.; Fed. R. Civ. P. 56(c). "'Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law. But if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment.'" Olson v. Bloomberg, 339 F.3d 730, 735 (8th Cir. 2003) (quoting Greiner v. City of Champlin, 27 F.3d 1346, 1352 (8th Cir. 1994) (citation omitted in Olson)).

## I. INDIVIDUAL LIABILITY OF WATERBURY, MCMILLIN, AND MERCHEN

An official is entitled to summary judgment on the ground of qualified immunity unless the plaintiff establishes that the official's conduct violated the plaintiff's clearly established constitutional rights. Coleman v. Parkman, 349 F.3d 534, 537-38 (8th Cir. 2003). The violation cannot be established merely by the deprivation of a constitutional right; the plaintiff must also show that the official knew such action amounted to a constitutional violation. Yellow Horse, 225 F.3d at 927. To prove such knowledge in the prisoner-suicide context, the plaintiff must show that the official was deliberately indifferent to a known risk of suicide. Id.; see also Coleman, 349 F.3d at 538 ("The Eighth Amendment prohibits officials from acting with deliberate indifference toward an inmate's substantial suicide risk, and the Fourteenth Amendment extends at least as much protection to pre-trial detainees . . . ." (citation omitted)). The parties here agree that Turney enjoyed a clearly established constitutional right to be protected from the risk of suicide. The question, then, is whether Waterbury, McMillin, or Merchen knew of and were deliberately indifferent to that risk. Coleman, 349 F.3d at 538 ("Once an official knows of a risk, the Eighth Amendment requires the official take reasonable measures to abate the risk.").

We first address this question for Sheriff Waterbury, viewing the evidence in the light most favorable to Turney. Waterbury personally knew Turney was volatile; in fact, the record shows Turney was initially transferred from the Bennett County jail to the Pennington County jail because he was a difficult inmate. When Turney was returned to Bennett County, Waterbury was told that Turney had tried to kill himself. It is undisputed that Waterbury knew Turney tried to kill himself in Pennington County's custody. Still, Waterbury did nothing to follow up with Pennington County about the details of Turney's attempted suicide. Had he done so, Waterbury would have found out that Turney used a bed sheet in his cell to try to hang himself just

-6-

three days earlier. Instead, Waterbury brought Turney to a cell, which was double-locked behind two sets of doors, contained a bed sheet and exposed ceiling bars, and ordered Turney to be left there alone.

Turney's claim against Waterbury is strengthened by evidence of Waterbury's conduct toward Merchen and McMillin. Instead of allowing Merchen to fill out an intake form for Turney (a form which included questions about past suicide attempts), Waterbury brought Turney directly to his cell. He then ordered Merchen not to enter the cell alone under any circumstances. Although he told Merchen to keep Turney under a close watch, this order provided no protection to Turney since Merchen could not actually enter Turney's cell in the event of an emergency. Waterbury claims that he told McMillin to keep a close eye on Turney,[1] but McMillin testified that this conversation never happened. In short, Waterbury's response to Turney's known suicide risk, which included not investigating the earlier attempt, not permitting Merchen to complete Turney's intake form, placing Turney in a cell alone with a bed sheet and exposed ceiling bars, and ordering Merchen not to enter Turney's cell without backup–yet leaving her as the only official at the jail–are facts which exhibit deliberate indifference." We thus reverse the district court's grant of qualified immunity as to Waterbury.

The issue of whether McMillin was properly held qualifiedly immune presents a closer case. He was the only deputy on duty on October 23rd, making him the only other official available to help Merchen with Turney, in light of Waterbury's orders. If McMillin knew that Waterbury forbade Merchen from entering the cell alone, we may consider it deliberately indifferent for McMillin to leave the jail except for

---

[1]Presumably if McMillin were at the jail when Turney hung himself, he and Merchen could have provided immediate assistance.

official business.[2]  That is not the case, however.  McMillin said that Waterbury did not give him any special instructions about Turney.  On the other hand, Waterbury claims he specifically told McMillin to keep a close eye on Turney.  Even accepting Waterbury's assertion for the purposes of this appeal, we fail to see how telling McMillin to closely watch an inmate could alert McMillin that Turney was suicidal.  In the absence of evidence that McMillin knew Turney presented a suicide risk, McMillin could not have acted with deliberate indifference toward that risk.  Accordingly, the district court properly granted summary judgment in favor of McMillin.

As to Merchen, Turney argues that her principal failing was not completing the jail intake form, which is typically done when an inmate arrives.  The intake form includes specific "yes or no" questions related to an inmate's health and welfare.  The final question inquires whether the inmate "ever tried suicide."  (Appellant's App. at 79.)  Following this question is a follow-up inquiry, which asks, "If yes, where at?" (Id.).  Merchen claims she did not fill out the form because Waterbury brought Turney directly from the squad car to his cell and ordered Merchen not to enter Turney's cell alone.  The evidence, though, indicates that Waterbury himself remained at the jail for approximately one and one-half hours after bringing Turney back to the Bennett County jail.  Merchen could have filled out the intake form during this time, and if she did, may have learned about Turney's recent suicide attempt.  In her deposition, however, Merchen stated that even without the form she understood that Turney was suicidal from Waterbury's instructions to watch him.  Perhaps completing the intake form would have informed Merchen about the details of Turney's past attempt, alerted Merchen to the current threat, and led her to remove Turney's sheets or undertaken other measures to protect Turney.  Obviously, any outcome which would have saved Turney's life begs the question of whether an

_____

[2]According to the plaintiff, McMillin was tending to his farm during the time of the hanging.

official should be held responsible for failing to follow that path. Our courts have determined that actors such as Merchen are immune from such liability except in limited circumstances, and we cannot conclude that her failure to complete a jail intake form exhibited deliberate indifference to Turney's risk of suicide. We affirm the district court as to Merchen.

## II.    ENTITY LIABILITY FOR THE SHERIFF'S DEPARTMENT, THE COUNTY, AND THE STATE

"In a section 1983 action, a municipality may only be held liable for constitutional violations which result from a policy or custom of the municipality." Yellow Horse, 225 F.3d at 928. A failure to properly train employees is one way in which an entity can exhibit deliberate indifference toward the rights of others. Id.

Turney simply asserts that Bennett County does not train its officers well enough in suicide screening and prevention. The county does, however, provide manuals that inform officers how to recognize and respond to suicide risks.[3] We agree with the district court that Turney has not met her burden in establishing that the training provided to Bennett County officials was inadequate, or that its current policies evinced a disregard for the constitutional rights of its jail inmates. We thus affirm the district court's grant of summary judgment in favor of the sheriff's department, county, and state.

## CONCLUSION

The district court granted qualified immunity in this § 1983 case to the Defendants, finding that Twylla Turney had not shown that the Defendants were

---

[3]We note that Turney makes no argument that the county is deliberately indifferent by thrusting known suicide risks like Turney into situations which increase their chances of success, such as a single cell with exposed bars and bed sheets.

deliberately indifferent to the medical needs of her son Bill, a known suicide risk. Viewing the facts in Turney's favor, we reverse the district court's grant of qualified immunity to Waterbury, and affirm as to McMillin, Merchen, the sheriff's department, county, and state.

_____